UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
Terre Haute Division

| | | |
|---|---|---|
| JUSTIN CASTELINO | ] | |
| Plaintiff, | ] | **Verified** |
| | ] | **COMPLAINT for Damages and** |
| v. | ] | **Pre-trial Injunctive Relief** |
| | ] | |
| ROSE-HULMAN INSTITUTE OF | ] | Cause No.: 2:17-cv-139 |
| TECHNOLOGY | ] | |
| Defendant. | | |

1.  As his complaint for damages and injunctive relief against the named Defendant, Mr.

Justin Castelino, Plaintiff, by his attorney John Thrasher, alleges:

2.  This is a civil action to redress discrimination and retaliation on the basis of disability

in violation of the Americans with Disabilities Act of 1990, found at 42 USC

§ 12182 et seq. ("ADA"), and its implementing regulation, 28 C.F.R. Part 36.  This action is

brought only after all available administrative procedures were timely filed and exhausted.

3.  It is also a suit for damages resulting from repetitive breaches of contract, breaches of

implied contract, defamation, false advertising, failure to provide due process protections based

on contract principles, negligence, harassment, failing to provide a duty of care to Mr. Castelino,

and breaching Mr. Castelino's rights as a third party beneficiary.

4.  Finally, the Plaintiff seeks pre-trial injunctive relief in the form of an Order by this

Court obligating the Defendant to expunge certain claims and disciplinary actions from

Plaintiff's record and allowing Plaintiff to go back to school pending the trial of this action,

along with other relief, all to mitigate the Plaintiff's damages.

**JURISDICTION AND VENUE**

5.  This Court has jurisdiction over this action pursuant to 42 U.S. Code § 2000a–3 and

§12188(b)(1)(B) and 28 U.S.C. §§ 1331 and 1345.

6.  Venue lies in this District pursuant to 28 U.S.C. § 1391(b). The acts of retaliation and discrimination alleged in this complaint occurred in this District, and the Defendant resides and is situated in this District.

## PARTIES

7.  The Plaintiff is Justin Castelino (hereinafter "the Plaintiff" or "Mr. Castelino").  He is a natural person and a resident of Stamford, Connecticut.

8.  The defendant is the Rose-Hulman Institute of Technology ("the Defendant" or "RHIT"), a not-for-profit corporation with its principle place of business in the City of Terre Haute, County of Vigo, State of Indiana.  It operates a school which is a "place of public accommodation" within the meaning of Title III of the ADA because its operations affect commerce and, among other things, it is a private place of education.  42 U.S.C. § 12181(7)(J); see 28 C.F.R. § 36.104. See 42 U.S.C. §§ 12181(7)(B), 12182(a); 28 C.F.R. § 36.104.

## FACTUAL ALLEGATIONS

9.  At the age of 3 years Mr. Castelino was diagnosed with Attention Deficit Hyperactivity Disorder and Auditory Processing Disorder.  These disorders are long term and may be incurable. They include an auditory processing disorder and perceptual impairment. They prevent his conscious mind from focusing if there are any visual or auditory distractions, and from assimilating information communicated verbally.

10.  These disorders are well-documented.

11.  These disorders meet the definition of "disability" found in 42 USC Sections 42 U.S.C. § 12102 (1)(A), (B) and ( C) and (2)(A), (B) and ( C).

12.  Mr. Castelino first applied for admission at RHIT in November 2010.  He then chose to defer his admission and RHIT accepted him in January, 2012 for the Fall quarter that year for which Mr. Castelino subsequently paid a fee to formerly enroll into RHIT.  Fall 2012, Mr. Castelino paid tuition and attended Orientation where RHIT had Mr. Castelino sign an agreement.

13.  At all times relevant hereto, Mr. Castelino was an adult.  For that reason, the Defendant did not put in place for Mr. Castelino a plan under Section 504 of the Rehabilitation Act of 1973, 29 USC Sec. 701 et seq.  It did not prepare an Individual Education Plan under the Individuals with Disabilities Education Act, 20 USC Sec. 1400 et sec.

14.  Instead, through Dr. Karen DeGrange, its Director of Disability Services, RHIT:

a) drafted and published "Guidelines for Students with Special Needs"

b) allowed Mr. Castelino to have an approved note taker accommodation to help make certain the content and meaning of lecture information was properly reflected in notes for Mr. Castelino's use.

c) promised Mr. Castelino that he would have access to a tutor to transcribe his notes to a single page for use during a CE380 exam.

d) specifically allowed Mr. Castelino to use a typed crib sheet rather than a hand-written one for a specific test in Dr. Chapman's CASE 380 class, and directed written notice of this to the head of that department.

e) informed Mr. Castelino that "The professor must make a reasonable location accommodation" for exams, "while providing the required extended time and required quiet environment.

f) advised Mr. Castelino that for a specific exam, "You will have your extended time amount.  You will be in a classroom that is near the classroom with the other students.  Dr. Aidoo (the instructor) will check on you from time to time to see if you have questions."

g) did not generalize these accommodations to other exams.

15.  RHIT, in the persons of its various faculty members, consistently disregarded Dr. DeGrange's Guidelines and RHIT policies and denied Mr. Castelino the reasonable accommodations required by the ADA.  These persons were:

a) Dr. Kevin G. Sutterer, Professor and Head, Department of Civil Engineering

b) Dr. Jeremy R. Chapman

c) Dr. Rick Stamper, Dean of Faculty, who had supervisory authority over all other actors

d) Dr. Michele K. Marincel Payne

e) Dr. James Hanson

f) Dr. John Aidoo

g) Dr. Michael Robinson

h) Dr. James Conwell, President

I) Dr. Karen DeGrange, Director of Disability Services

j) Dr. Elton Graves, Admissions Committee chair.

k) Dr. Richard P. Ditteon.

l) Mr. Erik Hayes, VP of Student Affairs and Dean of Students

16.  Acting through these individual faculty and staff members, the Rose Hulman Institute of Technology has on many occasions created harsh environments for Mr. Castelino that made receiving mandatory reasonable accommodations extremely difficult or denied them altogether.

Paragraphs No. 17 through 161 following are examples of acts which created this environment; the list is not exhaustive.

17.   Dr. James H. Hanson was one of Mr. Castelino's professors in 2013.

18.   He was reluctant to provide Mr. Castelino with reasonable accommodations.

19.   He refused to allow Mr. Castelino any extended testing time in a quiet testing room.

20.   For an EM201 exam, Dr. Hanson informed Mr. Castelino, "If you want to exercise your right to an additional 50 minutes, I need you to come in at 7:10 AM."

21. The classroom building did not open until 8:00 AM.  Dr. Hanson's decision obligated Mr. Castelino to sleep on the floor of the classroom the night before the exam, which required Dr. Hanson to provide to Mr. Castelino a permission slip to be on campus after the campus closed and to present to security officers if they confronted Mr. Castelino.

22.   As there was neither bed nor cot in the classroom, Dr. Hanson must have known that Mr. Castelino would not be able to sleep well enough to take the exam.  This is outrageously unreasonable and abusive.

23.   Dr. Hanson was so fascinated with how Mr. Castelino's mind worked that stated as much publicly and treated the Plaintiff like a lab rat, focused on studying and educating himself about Mr. Castelino's weaknesses and his diagnosed disabilities rather than on teaching.

24.   Dr. Hanson's behavior publicly embarrassed the Plaintiff.  This was an invasion of his privacy which damaged him in intangible ways.

25.   To stop this behavior, Mr. Castelino emailed his medical records to Dr. Hanson, with a request that he keep them confidential.  He wanted his professor to stop studying him and help him learn.

26.  By April 2014, professors within the Department of Civil Engineering had begun to tailor classes to exacerbate Mr. Castelino's disabilities.  This means that Dr. Hanson shared his medical records with the rest of the civil department faculty after Mr. Castelino specifically requested that he refrain from doing that.

27.  This is another damaging invasion of Mr. Castelino's privacy.

28.  In Dr. Hanson's Construction Management class, Mr. Castelino made arrangements to take the exam in a testing room.  Mr. Castelino went to the testing room and Dr. Hanson did not provide the exam.  Mr. Castelino walked over to the classroom where the class was taking the exam and asked Dr. Hanson, where is the exam and Dr. Hanson said "I have one right here for you."  Dr. Hanson made Mr. Castelino sit down and take the exam with the regular population with no extended time, thereby depriving Mr. Castelino of accommodations mandated by the Act.

29.  When Dr. Hanson wrote Mr. Castelino up for plagiarizing, classed as an academic misconduct, policy required he write up both students involved.   Dr. Hanson wrote only Mr. Castelino up.

30.  Dr. Michelle K. Marincel Payne was an RHIT professor during the relevant period.

31.  In May 2014 Mr. Castelino explained to RHIT in the person of Dr. Payne why the learning center was a better place to take exams when Mr. Castelino requested accommodation.

32.  The Learning Center is the required testing location according to Dr. DeGrange's _Guideline For Students With Disabilities_.  Only it has a controlled testing environment.

33.  After that, Dr. Payne came into the classroom where Mr. Castelino was taking an

exam and turned on speakers which played a hissing static noise. She left them on and left the room while Mr. Castelino was taking the exam.

34. Noise like that foreseeably diminishes the performance of anyone, particularly a person with Mr. Castelino's disabilities. For that reason, we charge Dr. Payne with the intent to diminish Mr. Castelino's performance.

35. Mr. Castelino complained to Dr. DeGrange about these matters. She conducted no investigation and no corrective action was taken.

36. Mr. Castelino reported to Dean Erik Hayes that he was being harassed by students who spreading untrue rumors about him and the obligatory RHIT accommodations. Mr. Castelino requested Dean Hayes investigate and call those students to a meeting to put an end to the harassment. Dean Hayes did not take any action whatsoever.

37. Dr. Kevin G. Sutterer was Mr. Castelino's faculty adviser as well as Head of the Department of Civil Engineering, the Department with the smallest student population at RHIT.

38. Mr. Castelino trusted that he could go to Dr. Sutterer with any problems, including professors who were reluctant to accommodate his disabilities.

39. As head of the Department, Dr. Sutterer had and has a conflict of interest between supporting his faculty team and supporting students who have a conflict with a faculty member.

40. In Mr. Castelino's case, Dr. Sutterer always sided with the professors.

41. During his conferences as faculty adviser, Dr. Sutterer frequently treated Mr. Castelino so harshly and unfairly that he caused tremendous stress and emotional distraught to Mr. Castelino. Mr. Castelino believes this too reduced the quality of his academic performance, as reflected by his academic record.

42.  On one occasion, for example, Dr. Sutterer responded to Mr. Castelino's complaints by saying that RHIT need provide only reasonable accommodations.  Upon Mr. Castelino requesting his accommodation, Dr. Sutterer asked Mr. Castelino if he wanted special treatment. In context this suggested that "reasonable accommodations" is a one-size-fits-all category, whether or not a student has a recognized disability.

43.  RHIT advertises that its learning center has tutoring for upperclassmen.

44.  When Mr. Castelino pointed out to Dr. Sutterer that some courses were so specialized that there were no tutors available, Dr. Sutterer promised he would hire students to tutor those courses.

45.  On numerous other occasions Mr. Castelino made certain that Dr. Sutterer was aware of the lack of support within the school.  Dr. Sutterer promised to address these matters, and did nothing.

46.  In November 2014 Mr. Castelino informed Dr. Sutterer that he had given Dr. Sutterer two years' notice about the lack of support within the learning center for courses that are important building blocks to Senior year courses.

47.  Dr. Sutterer had never addressed those problems as promised and suggested Mr. Castelino collaborate with the seniors in the Civil Engineering Learning Center.  Then he moved all the seniors into their own private study room so Mr. Castelino had no access to them.

48.  In spite of his employer's advertisements and the statute obligating it to accommodate Mr. Castelino's disabilities, Dr. Sutterer now claimed that RHIT does not provide tutors for upperclassmen because it's important for students to be independent thinkers.

49. Mr. Castelino had to go searching for help outside of RHIT in fundamental courses because the learning center did not have Civil tutors.

50. In April 2015 Mr. Castelino reported to Dr. Sutterer that Mr. Castelino had been denied the right to test in the learning center, a controlled environment for testing in a quiet area.

51. Dr. Sutterer replied that "the law requires that reasonable accommodations be provided. I was not clear about that when we spoke."

52. Dr. Sutterer's misunderstanding of what accommodations are reasonable led to more disagreements between him and Mr. Castelino. Dr. Sutterer and professors in his Department challenged Mr. Castelino's right to test in a quiet testing environment at each and every exam. Mr. Castelino needed always to plead and beg for reasonable accommodations and on at least one occasion when Mr. Castelino pleaded for his note taking accommodation, Dr. Sutterer has asked him if he was looking for special treatment.

53. "Special" treatment is required by the Americans with Disabilities Act.

54. It was not the task of Dr. Sutterer or the faculty in his Department to determine what accommodations are reasonable. That was set by the law, RHIT and Dr. DeGrange. Dr. Sutterer never addressed this matter.

55. Mr. Castelino also informed RHIT, in the person of Dr. DeGrange, about this matter. She never addressed it, either.

56. When Dr. DeGrange could not provide Mr Castelino with note taking services and overruled Dr. Sutterer's decision to allow him to reuse his note card from the previous year, Mr. Castelino explained that he only used what she said he may use under those circumstances.

57.  Dr. Sutterer claimed he emailed Mr. Castelino saying he gave Mr. Castelino permission to use a typed/printed note card but that is not true. It was Dr. DeGrange who told Mr. Castelino "you will be allowed to use your typed/printed sheet of notes for the test."

58.  Dr. Jeremy R. Chapman taught Mr. Castelino's CE 380 Transportation class.  Mr. Castelino took this class twice with Dr. Chapman and twice Dr. Chapman wrote him up for academic misconduct.

59.  In 2014 Dr. Chapman wrote up Mr. Castelino for plagiarizing another student's work when, in fact, the other student copied from Mr. Castelino.  The other student, from China, spoke English as a second language which caused the other student to misunderstand the instructions.

60.  Dr. Sutterer originally chose not to pass Dr. Chapman's first write-up on to the Rules & Discipline Committee and not to ask that Committee for action because the evidence did not support Dr. Chapman's complaint.

61.  As Head of the Department, Dr. Sutterer, Mr. Castelino's faculty adviser, saw a conflict of interest in removing Mr. Castelino's academic misconduct from his record but did say the evidence should exonerate Mr. Castelino.

62.  However, Dr. Sutterer added to the file that submitting duplicate work is still an academic misconduct even though it is not listed in the Student Handbook as an academic misconduct and the proscription is not published anywhere or made known to students that it is an academic misconduct.

63.  It is unreasonable to hold a student responsible for a policy when the school and/or the department had not provided the student with any access to the policy.  Dr. Sutterer fabricated the offense to persecute Mr. Castelino.

64. Dr. Chapman's only interest should be to write up the party guilty of plagiarism and support the student who is innocent.

65. Dr. Chapman did not charge Mr. Castelino with submitting duplicate work. Policy requires a process for charging a student and the policy to bring that charge forward was not followed.

66. Yet, according to Dr. Ditteon, Disciplinary Committee Chair, Mr. Castelino was found guilty on "all counts."

67. The other student came to Mr. Castelino's Disciplinary Hearing and admitted all of the above to the Committee. Yet, the Disciplinary Committee found Mr. Castelino guilty regardless.

68. This write-up is one of several incidents Plaintiff moves the Court to correct by pre-trial injunctive relief.

69. In the following year Mr. Castelino took the same class with Dr. Chapman.

70. On one occasion, Dr. Chapman, Dr. Chapman announced that his student's could prepare "crib sheets" and use them during an upcoming exam.

71. One day before the exam, he announced that these would be handwritten note cards, and that the entire class would sign the exam stating that the notes were in their own handwriting.

72. Dr. Chapman's premise for the handwritten requirement was to reinforce the learning process. However, in Mr. Castelino's case, the premise is moot because RHIT agreed to note taker assistance to transcribe the notes in handwriting to another note card.

73. Mr. Castelino did not sign the statement required by Dr. Chapman.

74. Dr. Chapman wrote Mr. Castelino up for Intellectual Property theft for using a printed chart on his permissible crib sheet after Dr. DeGrange gave Mr. Castelino permission to do so.

75. He also accused Mr. Castelino of lying about not having copy-and-paste graphs on his card.

76. Dr. Chapman has a Juris Doctor and is admitted to practice law in the State of Wisconsin. His course syllabus recited that a student can use printed or published materials to facilitate his own education, that this is not Intellectual Property Theft by virtue of the Fair Use Doctrine.

77. Either Dr. Chapman lied in his write up, or his course syllabus constitutes entrapment. Neither is a suitable way to behave toward one's students.

78. Mr. Castelino never lied, and lying is also not listed as an academic misconduct in the Student Handbook. Lying falls to a moral clause addressed as a non-academic misconduct.

79. Dr. Chapman's chargers were direct attacks on Mr. Castelino. They discriminated against him because of his disabilities, to discourage his attendance.

80. When he wrote Mr. Castelino up on this occasion, Dr. Chapman knew that, because of his disabilities, Mr. Castelino had requested note taker assistance, and his notes would not be in his own handwriting.

81. RHIT advertised online that tutors would be available in the Learning Center until 4:15 pm and in Percopo Residence Hall from 8:00 pm to 11:00 pm.

82. As one accommodation reasonably suited to Mr. Castelino's disabilities, RHIT agreed to provide note taking assistance to transcribe the note card.

83.  Because RHIT had tutor resources available to transcribe the note card, RHIT willfully chose not to provide Mr. Castelino with his note taking accommodation.

84.  Because of that choice, Mr. Castelino did his best to transcribe some of the copied-and-pasted graphs onto the note card in his own hand writing.

85.  Mr. Castelino was penalized for academic misconduct because of the form of the information on his card.

86.  Pasting printed matter to a crib card rather than transcribing it by hand does not give a student an unfair advantage over others who were able to transcribe.  It was not cheating and therefore did not rise to an academic misconduct defined in the Student Handbook, which is a contract between RHIT and Mr. Castelino.

87.   In addition to theft of intellectual property, RHIT believed Mr. Castelino lied about not having copied and pasted graphs on his note card.

88.  Had RHIT provided Mr. Castelino with his note taking accommodations, Dr. Chapman would have had no complaint RHIT would not have suspended Mr. Castelino.

89.  As it was, Dr. Chapman's complaint that Mr. Castelino with cheated and stole intellectual property reached the Rules & Discipline committee.

90.  Mr. Castelino never lied, and lying is also not listed as an academic misconduct in the Student Handbook.  Lying falls to a moral clause addressed as a non-academic misconduct. As non-academic misconduct, it should have been handled by a different process according to RHIT policies.

93.   As a practicing attorney, Dr. Chapman knew or should have known his charge against Mr. Castelino was false and inflammatory.  He made it with the intent to prejudice the Rules and Discipline committee, as well as the sort of retaliation prohibited by the Act.

94.   On or about May 7, 2015 RHIT, in the person of Dr. Sutterer, signed a course drop slip giving Mr. Castelino permission to withdraw from Dr. Chapman's CE 380 Transportation class, and on May 12, 2015 withdrew his signature under false pretenses and with full knowledge that the falsehood defamed Mr. Castelino.

95.   With family support, Mr. Castelino went to Dr. Chapman's office on May 8, 2015, the deadline for the drop/add slip.

96.   Dr. Chapman was not available and his secretary said he was expected back by 4:30 pm.  Mr. Castelino asked the secretary to tell Dr. Chapman that Mr. Castelino would return shortly from the registrar's office to obtain Dr. Chapman's signature for a drop course slip.  The secretary agreed.

97.   At the registrar's office Mr. Castelino's family representative asked Jan Pink, the Registrar, for an extension to withdraw from a course as the Professor had not been available. Jan Pink agreed to the extension.

98.   Mr. Castelino provided to Jan Pink his withdrawal slip with original signatures; Ms. Pink placed a photocopy of the withdrawal slip, with Dr. Sutterer's dated signature, in her file. She stated that because the Head of the Department, Dr. Sutterer, had signed.  Policy did not require the course Professor's signature if the Department Head has already signed the drop slip. Ms. Pink considered the withdrawal form complete but would give Mr. Castelino the extra time.

99.   Soon after, Mr. Castelino sent email to Dr. Chapman to say he had been trying to

reach him to discuss his grades and the possibility of dropping the course. Mr. Castelino further explained that Jan Pink authorized an extension for Mr. Castelino and Dr. Chapman to speak and to see what happens with the Disciplinary Hearing so that Mr. Castelino can make an informed decision. Dr. Chapman responded that he was opposed to this wait and see.

100. On May 12, 2015 Dr. Sutterer sent Mr. Castelino a scathing email where Dr. Sutterer copied a number of others including a member of the Disciplinary Hearing. The email accused Mr. Castelino of misrepresenting his meeting with Jan Pink and said that Mr. Castelino obtained his signature based on information that was not truthful.

101. This humiliated and defamed Mr. Castelino, and it prejudiced those copied on that email who were to be part of his Disciplinary Committee.

102. Dr. Sutterer lied in that scathing and defamatory e-mail about the nature of Mr. Castelino's "untruthful" information.

103. Furthermore, the lies Dr. Sutterer said Mr. Castelino told to get Dr. Sutterer's signature related to events that occurred after Dr. Sutterer signed. This is further proof of Dr. Sutterer's conflict of interest and willingness to defame and persecute Mr. Castelino.

104. In the person of Dr. John K. Aidoo, RHIT denied Mr. Castelino his right to test in the learning center in a controlled quiet testing environment, and, on at least one other occasion, asked Mr. Castelino if he would like to use accommodations in front of other students, which would only add to how much other students knew about his accommodations.

105. This invasion of privacy damaged Mr. Castelino by making classmates reluctant to have Mr. Castelino work in their group. They did not want to work with a student who received "special treatment," i.e., mandated accommodations for a learning disability.

106.  In the person of Dr. Michael A. Robinson, RHIT taught a GIS course in which the students could use computers for the final exam.

107.  Mr. Castelino was unable to finish that exam because the computer available for his use did not process the commands for the given problems.

108.  The learning center testing proctor witnessed that the computer took more than 20 minutes to execute a simple command, which diminished accommodation test time.  He tried to reach Dr. Robinson about the problem from the learning center.  Dr. Robinson was not available.

109.  Because of the computer malfunction and to compensate for the malfunction time, Mr. Castelino could finish the exam only if he stayed in the Learning Center until after it closed for the day.  This was not possible.

110.   Mr. Castelino left the learning center 40 minutes before his four hours ended, but only after the exam proctor tried and failed to contact Dr. Robinson, and only after Mr. Castelino tried to work through the computer problem after troubleshooting it for more than an hour with no success.

111.  Mr. Castelino later explained the glitch and the delay to Dr. Robinson.  Dr. Robinson had no concern with Mr. Castelino's computer problem and, despite the proctor's corroboration, claimed that Mr. Castelino had his full four hours for the exam.

112.  On February 26, 2015 Mr. Castelino sent written confirmation that the proctor observed the computer glitch to Dr. Sutterer, Dr. DeGrange, James Hoffmann and Kelly Martin.

113.  Among other titles, Dr. Karen A. DeGrange is and was RHIT's Director of Disability Services.

114. Dr. Sutterer claimed that, regardless of the computer malfunction, Mr. Castelino was at fault if he did not get his accommodation time for that exam.

115. This is unreasonable. Even if Mr. Castelino stayed for the entire 4 hours, he could not finish the exam because the computer froze.

116. In short, it was the Defendant's hardware, and not Mr. Castelino, which prevented him from obtaining his accommodation test time.

117. Mr. Castelino requested that Dr. DeGrange conduct an investigation on whether Dr. Robinson and Dr. Sutterer were handling his case fairly. She asked him to investigate it himself.

118. Forcing Mr. Castelino to conduct any part of his own investigation constituted additional denial of his mandated accommodations.

119. On March 3, 2015 Mr. Castelino's family representative sent an email to Dean Gustafson, notifying him that Dr. DeGrange resisted investigating whether RHIT and its faculty were accommodating Mr. Castelino's disabilities as required by law.

120. Only after Mr. Castelino's family members complained to the Dean about Dr. DeGrange's reluctance to investigate was Dr. De Grange willing to help Mr. Castelino investigate what happened in the case of the computer malfunction.

121. In the end, the Defendant by its faculty refused to allow Mr. Castelino to retake the test on a working computer.

122. Dr. Robinson assumed Mr. Castelino would have received a grade of C on the finished exam based on previous homework. This was mere speculation, which would not have been allowed for another, similarly situated but able student.

123.  Dr. Sutterer and Dr. DeGrange agreed to this resolution.  That injured Mr. Castelino in both tangible and intangible ways.

124.  In April 2015 Mr. Castelino informed Dr DeGrange that:

a) professors treated him like a guinea pig, playing noises in the background and etc. while he took his exams;

b) Dr. Hanson was more interested in studying how Mr. Castelino's mind works rather than assisting him to learn;

c)  Dr. Aidoo would not allow Mr. Castelino to test in the learning center, but tested him in a conference room which is not a controlled quiet testing place, and further invaded his privacy by discussing his accommodations in front of other students;

d)  Professors in the Department of Civil Engineering consistently challenged Mr. Castelino's statutory right to reasonable accommodations.

125.  Dr. DeGrange responded by telling Mr. Castelino that professors are not required to test students in the learning center.  This contradicted her own Guideline For Students With Disabilities, which states that arrangements must be made with the learning center for testing accommodations.

126.  Dr. DeGrange insured that Mr. Castelino was to receive extra time for exams.  She did not insure that he would be tested in a quiet testing location.  This permitted any professor to intentionally to set-up Mr. Castelino for failure by either playing noises on the speakers, talking outside of the conference room, or ensuring that no one would sit outside the conference room distracting him.

127.  Since Mr. Castelino got only one attempt at each exam, he could not afford any distractions, including anyone who may intentionally cause noise to distract him.

128.  On December 1, 2015 Mr. Castelino thoroughly explained his frustrations with the Civil Engineering Department's failure to provide him with reasonable accommodations.

129.  Dr. DeGrange sent Mr. Castelino instructions on receiving accommodations in the learning center, where professors are required to accommodate his needs for a quiet testing environment with no distractions.

130.  Dr. DeGrange approved Mr. Castelino's note taking assistance accommodations and RHIT never provided it.

131.  RHIT had other tutor resources available but chose not to provide or offer those resources to Mr. Castelino.

132.  Because of that, Dr. DeGrange gave Mr. Castelino permission to use his typed or printed crib sheet for the test.  Not only did she make no stipulations or set any restrictions as to permissible copy & paste, she stated that he could use his printed sheet.

133.  In spite of that, by its faculty RHIT penalized Mr. Castelino for using a cribsheet to which he had pasted printed graphs though  everything was supposed to be handwritten.

135.  During his days enrolled at RHIT, Dr. DeGrange continually ignored Mr. Castelino's concerns that his professors intentionally distracted him during exams or are put him in situations which did not provide his reasonable accommodations.

136.  Dr. DeGrange continually ignored Mr. Castelino's charge that the conference room has thin walls and can hear professors speaking in their offices and hear the secretary speaking to

students.  In addition, she continually ignored his complaint that his professors kept the door open during his exams exam.  This enabled any conversations outside to disturb Mr. Castelino.

137.  Dr. DeGrange continually ignored Mr. Castelino's concerns about his right to privacy.  Testing him in a conference room where the rest of the class can see him (because professors would leave the doors open) called unwanted attention to his  accommodations which led to students discriminating against him.

138.  These are examples of the discriminatory treatment Mr. Castelino has received from RHIT and its faculty.  This list of examples is representative, but it is by no means exhaustive.

139.  In May, 2015, after nearly three years, RHIT suspended Mr. Castelino for one quarter on the grounds of academic misconduct.

140.  After suspension and per RHIT policy, he applied for admission in January and June, 2016.

141.  Through the members of its Admissions Committee and by means of the procedure they used to consider his application, RHIT continued to discriminate against Mr. Castelino before and during his admission hearing in March, 2016.

142.  The Defendant designed that 2nd admission hearing as retaliatory and to keep out an ADA student because they did not want one in their school.

143.  In the person of Dr. Richard Ditteon, Defendant refused Mr. Castelino's request for an attorney to be present on the grounds that an attorney's presence would "prejudice the committee regardless of the facts."

144.  The RHIT Hearing Procedures specify that "No member of the panel may be a practicing attorney"

145.  In violation of hearing rules, Attorney Holly Reedy was a non-voting member of the panel for Mr. Castelino's 2nd Admission hearing on June 10, 2016.

146.  RHIT's Employee Handbook recites that it is illegal to ask about arrests where there is no conviction.

147.  RHIT violated their own admission procedures in a discriminatory manner when they asked Mr. Castelino about an arrest.

148.  The Faculty Handbook is a contract between RHIT and its faculty members.  Its students, including Mr. Castelino, are third party beneficiaries of that contract.  As such, they each have standing to enforce it.

149.  The Faculty Handbook requires all Committees to follow Roberts Rules of Order. That Handbook permits only the Admissions Committee the option to waive them.  Roberts Rules of Order requires a formal motion to suspend the rules.  The Committee did not vote on a motion to suspend its rules of procedure.

150.  Roberts Rules of Order require the Defendant's committees to notify all parties of the issues on an agenda.

151.  Because of his disabilities, Mr. Castelino needed extra time to prepare for the hearing.

152.  The Defendant's admissions board disregarded Roberts Rules without a formal motion to suspend them, never notified Mr. Castelino of all the items on its agenda and did not give him an opportunity to prepare.  This prejudiced Mr. Castelino who cannot adapt quickly to lack of order because of his disabilities.

153.  The Defendant supported its negative decision by relying on allegations of non-academic misconduct which had nothing to do with Mr. Castelino's original suspension, were neither addressed nor resolved when the allegations were originally made, and were therefore outside the scope of the Admissions Committee's authority.

153.  The Defendant's Committee entertained and acted upon three separate charges of academic misconduct which led to Mr. Castelino's suspension.  In spite of the charges leveled against him, Mr. Castelino's acts that did not violate the Student Handbook and RHIT did not follow its own policies.

154.  In spite of evidence in its possession, RHIT continues to misrepresent the facts and misquote Mr. Castelino's witnesses to excuse exclusion of him for his disabilities.

155.  The Defendant denied admission to Mr. Castelino on the grounds that he did not accept responsibility for the academic misconduct for which he was previously suspended for one quarter, and he was not prepared for the Spring Quarter.

156.  Mr. Castelino accepted responsibility for actions that led to a finding of academic misconduct.

157.  If Mr. Castelino was not prepared for Spring Quarter, this resulted from RHIT's policy and practice of denying him the accommodations required by the Americans with Disabilities Act.

158.  Dr. Sutterer did not help Justin prepare a course plan for when he was planning to return to Rose but instead retaliated because Justin filed complaint against Dr. Sutterer with the Indiana Civil Rights Commission.  This violated the ADA.

159.  Dr. Sutterer found the time to give the Admission Committee reasons to not allow Justin back into school and had a conflict of interest in making sure that Justin was prepared to come back to school.

160.  The Admission Committee penalized Mr. Castelino for following his faculty advisor's advice, pushed for him to take more than 12 credit hours that semester and said he should have his entire senior year memorized.  This was unreasonable and unnecessary.

161.  Defendant, by its admissions board and its President, Dr. Cromwell, denied Mr. Castelino admission in reliance on unsupported allegations of threatening behavior towards students, faculty and/or administrators, without evidence.  Again, this was a pretext to support expulsion because of Mr. Castelino's disabilities.

## CAUSE OF ACTION.

### 1.  The Americans with Disabilities Act.

162.  Plaintiff here inserts all the previous numbered paragraphs.

163.  These allegations detail examples of multiple violations by RHIT of the ADA and of Mr. Castelino's rights thereunder.

164.  These violations damage the Plaintiff financially because, but for those, he would graduate in May, 2016 from the prestigious Rose-Hulman Institute of Technology with a four-year degree in Civil Engineering and would, with reasonable certainty, thereafter be earning a median income of $70,000.00 each year, gross, by his employment as an Engineer.  Plaintiff demands $70,000.00 per year from May 31, 2016 until such time as he is actually able to find employment in his chosen field.

165.  These violations further damage Plaintiff because his record is now replete with multiple academic misconduct findings.  His record renders his applications to equally prestigious schools unacceptable.  The median income he may expect with a degree from lesser schools is commensurately less and will remain so through his working life.

166.  In compensation, Plaintiff demands of RHIT a lump sum reducing to present value the difference between a projected life-time median income for a civil engineering graduate of RHIT and the projected life-time median income which statistics show may be expected by a civil engineering graduate of the school he can actually attend, because of his record.

167.  These violations further damage Plaintiff because they constitute public humiliation, defamation, invasion of privacy, harassment, and breach of a duty owed him as a third party beneficiary of contracts negotiated between RHIT and its faculty members.

168.  These later damages are intangible.  Plaintiff demands $250,000.00 in compensation.

169.  In the alternative, Plaintiff moves this Court for a preliminary or final injunction obligating the Defendant to clear Plaintiff's academic record of all misconduct findings and proceedings and admitting him once again as a student in the Civil Engineering Department at RHIT Institute of Technology and obligating the Defendant and every single member of its faculty and staff to grant him accommodations which are reasonable in view of his disabilities. These must include:

a) a written, published and enforceable "Guidelines for Students with Special Needs"

b) approved and available note taker accommodation to help make certain the content and meaning of lecture information is properly reflected in notes for Mr. Castelino's use.

c) access at reasonable times and reasonable and accessible places to a competent tutor or graduate resident assistant, as needed, to assist Mr. Castelino in absorbing course material.

d) specifically allowing Mr. Castelino to use a typed crib sheet rather than a hand-written one whenever other students are permitted a crib-sheet of any kind.

e) reasonable location accommodation and extended time for exams.  Locations will be deemed "reasonable" only if they can be sealed from sound pollution and visual distractions.

170.  To recover the same equanimity he could reasonably expect if he had the support RHIT offers and provides to its other students, Mr. Castelino has required otherwise unnecessary psychiatric and psychological counseling.   He demands compensation for these added expenses from RHIT.

171.  Finally, Mr. Castelino demands a judgment against the Defendant in the amount of his reasonable attorney's fees and all costs of this suit, including the cost of any bond the Court may require under FRCP Rule 65( c).

### 2.  Claims arising under Indiana law.

172.  Plaintiff here incorporates and reasserts the factual allegations in all Rhetorical Paragraphs herein.

173.  By virtue of 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over these claim.

174.  By virtue of 28 U.S. Code § 1332(a)(1) this Court has jurisdiction over these claims because the parties reside in different States and the damages exceed the jurisdictional minimum.

### A.  Breach of Contract.

175.  Each student, including Mr. Castelino, expects value for the consideration they give

in the form of tuition.  By accepting tuition payments, RHIT implicitly promises to give that value in the form of a quality education.  The elements of contract are an exchange of promise for promise, or promise for payment, and this contract existed between RHIT and Mr. Casetlino.

176.  Under Indiana law, whether this contract is written or implied, it implicitly binds each party to comply with every applicable statute.

177.  The Americans with Disability Act applied to Justin Castelino and is implicitly part of his contract with the Defendant.

178.  Every time RHIT or its employees did or failed to do anything with the result that Mr. Castelino was deprived of the reasonable accommodations mandated by the ADA, that action or failure breached its contract with Mr. Castelino, depriving him of the use and value of the money he paid to attend class there and acquire salable skills.

179.  These breaches have damaged Mr. Castelino in the amount of $70,000.00 in tuition, plus his outlay for books, supplies and living expenses; the cost of private tutoring; and the value of three years of his time.

180.  Mr. Castelino demands a judgment against the Defendant in an amount to be proved at trial sufficient to compensate him for these losses.

**B. Defamation.**

181.  By charging Mr. Castelino with the academic misconducts of theft of intellectual property and lying, Dr. Chapman defamed the Plaintiff in excess of any qualified privilege.

182.  By lying about his signature on Mr. Castelino's course drop sheet to members of the faculty, especially the members of Mr. Castelino's Rules and Discipline Committee, Dr. Sutterer defamed Mr. Castelino in excess of any qualified privilege.

183.  These defamations foreseeably resulted in Mr. Castelino's suspension by the Admissions Committee of RHIT and substantially contributed to his prospective damages.  Mr. Castelino demands a judgment against RHIT sufficient to compensate him for the reduction in prospective income which will proximately result from his suspension.

### C.  False Advertising.

184.  RHIT advertised online that tutors would be available to undergraduates in the Learning Center and in residence halls during specified hours.

185.  These ads helped to persuade Mr. Castelino to apply to and attend RHIT for which, prior to suspension, he paid $70,000.00 in tuition on top of $26,000.00 in interest-bearing loans, and his supsension deprived him of the benefit of merit awards and scholarships.

186.  The advertisements were false.  The tutoring help Mr. Castelino was promised was not available when he needed it.

187.  Reliance on RHIT's false advertising damaged Plaintiff financially in the form of the costs of attendance, including tuition, private tutoring, books, lodging, equipment, supplies and transportation.

### D.  Invasion of privacy.

188.  Dr. Hanson was so fascinated with how Mr. Castelino's mind worked that he stated as much publicly and treated the Plaintiff like a lab rat, focused on studying and educating himself about Mr. Castelino's weaknesses and his diagnosed disabilities rather than on teaching.

189.  To stop this behavior, Mr. Castelino surrendered his medical records to Dr. Hanson with strict instructions that they were to be kept confidential.

190.  Dr. Hanson shared those medical records with the faculty of RHIT.

191.  Dr. Hanson's behavior publicly embarrassed Mr. Castelino.  It guided his colleagues to make Mr. Castelino's life as a student even more difficult, thereby damaging him in intangible ways.

192.  Dr. John K. Aidoo discussed Mr. Castelino's accommodations in front of other students; denied Mr. Castelino his right to test in the learning center in a controlled quiet testing environment; and, on at least one other occasion, asked Mr. Castelino if he would like to use accommodations in front of other students, which would only add to how much other students knew about Mr. Castelino's accommodations.

193.  This invasion of privacy damaged Mr. Castelino by making classmates reluctant to have Mr. Castelino work in their group.   They did not want to work with a student who received "special treatment," i.e., mandated accommodations for a learning disability.

194.  Dr. DeGrange contributed to the damages Mr. Castelino suffered as a result of these invasions.  Despite her position as Director of Disability Services and notice received from Mr. Castelino, she took no action to enforce his rights.

195.  These actions collectively have damaged Mr. Castelino in intangible but compensable ways.  He demands a judgment of $250,000.00 in compensation for these invasions of his privacy and other intangibles.

**E.  Harassment.**

196.  The treatment Mr. Castelino received from the faculty members specifically named throughout this complaint, but especially from Dr. Hanson, Dr. Chapman and Dr. Sutterer, constituted harassment.

197.  This harassment resulted, predictably and ultimately, in Mr. Castelino's suspension,

the loss of his investment in RHIT schooling, and the diminution of his projected lifetime earnings.

## 3.  DAMAGES.

198.  Mr. Castelino has been damaged by these breaches several ways.  Either he lost his tuition and other costs of attending, plus three years of his time, which has intangible value; and he lost the opportunity to earn the median income of a civil engineer from the date of his prospective RHIT degree until he can earn a degree that has a market value commensurate with one from RHIT and find employment and a median income as a civil engineer.

199.  Both these measures will be proved at trial.

200.  An emergency exists, because administrative preparations for the Fall Quarter 2017 are already underway and the longer Mr. Castelino waits for a judgment, the higher and faster his damages will rise.

201.  Mr. Castelino is obligated to mitigate his damages.

202.  Because of his record at RHIT, he believes it will be impossible to gain admission to another engineering school.

203.  If Mr. Castelino is to mitigate damages, he needs the Court's assistance and an order enjoining RHIT to clear all processes involving the phrase "academic misconduct" from his academic record.

204.  He also demands a judgment against the Defendant which awards damages in these amounts:

a)  The cost of private tutoring sources while a student at RHIT;

b)  $210,000.00 to represent the three years by which Mr. Castelino's graduation, degree

and career have been delayed by RHIT's refusal to grant him obligatory accommodations;

c) $70,000.00, representing a full refund of the tuition Mr. Castelino has paid RHIT in three years;

d) an additional amount to sufficient to recover the cost of books, private tutors, supplies, meal plan, mandatory health insurance, residential expenses incurred, mandatory lap top purchase and any and all other monies RHIT collected or demanded in reliance on its false advertising and failure to provide academic support;

e) An amount equal to the difference between Plaintiff's projected median income after he graduates from another school, and the median income RHIT told him he could expect as a graduate of RHIT, for each year of the balance of Plaintiff's projected working life;

g) $250,000.00 in compensation for public humiliation, defamation, invasion of privacy, harassment, and breach of a duty owed Plaintiff as a third party beneficiary of contracts negotiated between RHIT and its faculty members;

h) the total Mr. Castelino will have paid for otherwise unnecessary counseling or therapy, of whatever type; and finally,

i) punitive damage for the civil wrongs recognized by Indiana law, such as invasion of privacy, defamation, harassment and false advertising;

all reduced to present value and paid in cash, and finally, Plaintiff demands of Defendant a judgment sufficient to pay Plaintiff's reasonable attorney's fees and any and all other costs related to this matter, and granting all other just and proper relief.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that this Court enter judgment:

A. Declaring that Defendant have violated Title III of the ADA and its implementing Regulations;

B. Declaring that the Defendant, acting through its agents and faculty, breached its agreement(s) with the Plaintiff;

C. Granting pre-trial injunctive relief of the Defendant which

1. clears all actions relating to, and charges of, academic misconduct from Plaintiff's academic record and admit him as a student on the campus of RHIT;

2. restores his merit scholarships and awards to put him where he would be financially but for the offenses complained of;

3. obligates RHIT to allow Mr. Castelino to resume the curriculum path in place when Mr. Castelino originally enrolled at RHIT, and obligates its employees to grant and allow Mr. Castelino specific, verifiable and enforceable accommodations suited to his documented disabilities;

4. prohibits RHIT from disclosing any and all disciplinary actions that predate the Court's order, and from using anything that predates the Court's order against Mr. Castelino as a member of its student body;

5. obligates RHIT to provide upperclassmen tutoring in all areas where Mr. Castelino requests support, in accordance with RHIT advertisements; and

6. obligates RHIT to make every good faith effort to provide Mr. Castelino with on-campus housing;

D. Failing pre-trial relief, granting a permanent injunction to these same effects as part of any favorable judgment;

E.  Rendering a judgment for the Plaintiff and against the Defendant which awards damages sufficient to compensate him for the losses scheduled in Paragraph 204 herein, plus reasonable legal fees and the costs of this action, to include the premium on any bond required by Federal Rule 65.  Finally, Plaintiff demands a judgment against the Defendant granting all other just and proper relief.

Respectfully submitted,

s/:        John Thrasher
John Thrasher, Plaintiff's Attorney
License No. 1074-49
818 Chapelwood Blvd.
Indianapolis, IN 46214
Ph. 317-366-1087

**Verification:** Under the penalties for perjury, I verify that the foregoing statements of fact are true and accurate.  I verify these from my own personal experience.

s/:        Justin Castelino
Justin Castelino, Plaintiff.