# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JUSTIN CASTELINO, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 2:17-cv-139-WTL-MJD** |
| | ) | |
| ROSE-HULMAN INSTITUTE OF | ) | |
| TECHNOLOGY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

This cause is before the Court on the parties' motions for summary judgment (Dkt. Nos. 236 and 254).  The motions are fully briefed and the Court, being duly advised, rules as follows.

## I.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.").  When the Court reviews cross-motions for summary judgment, as is the case here, "we construe all inferences in favor of the party against whom the motion under consideration is made." *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quotation omitted).  "'[W]e look to the burden of proof that each party would bear on an issue of trial.'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th

Cir. 2007) (quoting *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)).

However, a party who bears the burden of proof on a particular issue may not rest on its

pleadings, but must show what evidence it has that there is a genuine issue of material fact that

requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). The non-

moving party bears the burden of specifically identifying the relevant evidence of record, and

"the court is not required to scour the record in search of evidence to defeat a motion for

summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).[1]

Also relevant to the resolution of the instant motions is this district's Local Rule 56-1,

which provides, in relevant part:

> **(a) Movant's Obligations.** A party seeking summary judgment must file and
> serve a supporting brief and any evidence (that is not already in the record) that

---

[1]The Plaintiff's briefs contain certain statements that suggest he believes that the Defendant was required to produce evidence to successfully defend against the Plaintiff's motion for summary judgment or demonstrate that it was entitled to summary judgment. *See, e.g.*, Dkt. No. 237 at 1 ("The Court may grant Plaintiff summary judgment if the Defendant fails to establish an element that is essential to its defense."); Dkt. No. 264 at 1 ("To win a dismissal, the Defendant must produce enough substantive evidence to require a verdict against Justin."); Dkt. No. 291 at 7 ("To raise a genuine issue of fact and defeat [the Plaintiff's] pending Motion, the Defendant must produce enough substantive evidence to require a verdict against [the Plaintiff]."). This is incorrect. "There is no requirement that the moving party support its motion with any evidence negating the opponent's claim." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018). Because the Plaintiff has the burden of proof on all of his claims, all the Defendant was required to do to avoid or obtain summary judgment on a claim was demonstrate that the Plaintiff failed to point to evidence that, drawing all reasonable inferences in the Plaintiff's favor, was sufficient to support a verdict in favor of the Plaintiff on that claim. The Court also notes that the Plaintiff incorrectly refers to Indiana Trial Rule 56 as "functionally equivalent" to the federal summary judgment rule. *See* Dkt. No. 237 at 2. In fact, the two differ in very significant respects. *Mundia v. Drendall Law Office, P.C.*, 77 N.E.3d 846, 853 (Ind. Ct. App. 2017) ("Unlike federal practice, in Indiana, a moving party is *not* entitled to summary judgment where it merely asserts that the opposing party lacks evidence on an element to prove its claim. Instead, [Indiana] Courts impose a more onerous burden and require a moving party to affirmatively negate an opponent's claim.") (citations and internal quotation marks omitted).

the party relies on to support the motion. The brief must include a section labeled "Statement of Material Facts Not in Dispute" containing the facts:

   **(1)** that are potentially determinative of the motion; and

   **(2)** as to which the movant contends there is no genuine issue.

**(b) Non-Movant's Obligations.** A party opposing a summary judgment motion must, within 28 days after the movant serves the motion, file and serve a response brief and any evidence (that is not already in the record) that the party relies on to oppose the motion. The response must include a section labeled "Statement of Material Facts in Dispute" that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment.

***

**(e) Citations to Supporting Facts.** A party must support each fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence. The evidence must be in the record or in an appendix to the brief. The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence.

**(f)  Court's Assumptions About Facts.** In deciding a summary judgment motion, the court will assume that:

   **(1)** the facts as claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that:

      **(A)** the non-movant specifically controverts the facts in that party's "Statement of Material Facts in Dispute" with admissible evidence; or

      **(B)** it is shown that the movant's facts are not supported by admissible evidence; or

      **(C)** the facts, alone or in conjunction with other admissible evidence, allow the court to draw reasonable inferences in the non-movant's favor sufficient to preclude summary judgment.

   **(2)** facts that a non-movant asserts are true to the extent admissible evidence supports them.

The Court is entitled to enforce these rules.  *Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 856 (7th Cir. 2017) ("The district judge held that the material facts are

undisputed because [the Plaintiffs] failed to include a section labeled 'Statement of Material Facts in Dispute' in their brief as required by local rule. *See* S.D. Ind. L. R. 56-1(b). The Plaintiffs] challenge that holding, but the judge has broad discretion to enforce the local rules, *see Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994), and we see no abuse of discretion here.").

## II. <u>BACKGROUND FACTS</u>

As noted, both parties have moved for summary judgment. Unless otherwise noted, the following facts are asserted by a party, properly supported in the record, and taken as true by the Court because they are not properly controverted by the opposing party.[2] Additional relevant facts are included in the discussion section below.

### A. Castelino's Disability and Requested Accommodations

Plaintiff Justin Castelino enrolled as a transfer student at Defendant Rose-Hulman Institute of Technology ("Rose-Hulman") in the fall of 2012. Castelino has "an impairment that substantially limits neurological and brain functions and major life activities including learning, reading, concentrating, thinking, communicating, and working." Dkt. No. 237 at 3. His doctor

---

[2]The Plaintiff's response to the Defendant's motion for summary judgment does not contain a section entitled Statement of Material Facts in Dispute or anything similar, and the Plaintiff does not directly address the facts asserted by the Defendant in its Statement of Undisputed Material Facts. Accordingly, those facts are subject to being treated as uncontroverted pursuant to Local Rule 56-1(f) to the extent that they are properly supported by the evidence cited by the Defendant. The Court nonetheless has considered the Plaintiff's comments on the Defendant's exhibits, found at Dkt. No. 264 at 29-35, to the extent that they can be read as disputing the factual assertions the exhibits are offered to support. In considering the Defendant's motion, the Court also has considered the properly supported facts set forth in the Plaintiff's brief in support of his own motion for summary judgment.

describes his disability as "related with [sic] slow processing and issues with registration/recall." *Id.*

Rose-Hulman requires applicants who seek accommodations for disabilities to certify their disabilities within the three years prior to their enrollment.  Castelino submitted to examinations on October 21, 2011, and November 18, 2011, which resulted in diagnoses of "attention-deficit/hyperactivity disorder, predominantly inattentive type" and "learning disorder NOS."  Dkt. No. 56-1 at 6.  The examiner's report noted that "clinical history (and) the current test findings are consistent with his previously established neurodevelopmental attention deficit disorder and learning disability," and that:

> [r]esults of the neuropsychological evaluation showed mild impairment on measures of sustained attention, processing speed, and certain linguistic functions, in the context of an otherwise normal neurocognitive profile.  Assessment of his mood and personality indicates essentially normal psychological functioning, with the exception of longstanding inattention and some impulse control issues.

*Id.*  The examiner recommended that the following "previously recommended academic accommodations" be continued:  extended time on tests; academic tutoring; and the option of recording lectures and having copies of lecture outlines available to him during the lectures.  *Id.* at 7.

It is Rose-Hulman's policy to consider accommodations for students with disabilities on a case-by-case basis.  Dkt. No. 126-12 at 3.  Students are directed to contact the Director of Disability Services, who "reviews documentation provided by the student and, in consultation with the student, determines which accommodations are appropriate to the student's particular needs and academic programs."  *Id.* at 3-4.  Castelino submitted a Disability Disclosure Form to the Director of Disability Services, Karen DeGrange, on which he stated that his disability was "ADHD [and] auditory and visual processing disorder."  Dkt. No. 246-43.  He requested the

accommodations of "recording [and] double test time." *Id.* Each quarter, Dr. DeGrange would notify Castelino's professors that he was entitled to the accommodation of 100% extended time on timed in-class tests and assignments in a quiet, distraction-free environment.

### B. Pre-2015 Events

During the spring quarter of 2012-13, Dr. James Hanson required Castelino to take his exam in the regular classroom rather than a quiet location.

In 2013, Dr. Hanson observed Castelino copying from another student's homework before class began. Dr. Hanson gave Castelino a zero on the assignment and placed a letter of academic misconduct in his file. Castelino appealed Dr. Hanson's decision to the Rules and Discipline Committee, which upheld Dr. Hanson's decision.

In May 2014, Dr. Jeremy Chapman reported Castelino for a second act of academic misconduct for submitting an answer that was almost identical to another student's work. Because it was the second charge of academic misconduct against Castelino, Dr. Kevin Sutterer, the relevant department head, had the option of referring Castelino to the Rules and Discipline Committee for possible dismissal, but he chose not to do so because Castelino claimed the incident was a misunderstanding and Dr. Sutterer found that there was "some doubt as to whether the submitted duplicate work was intentional or due to a misunderstanding." Dkt. No. 246-3 at 2.[3] Nonetheless, Dr. Sutterer found that "[r]egardless of how the duplication of work

_____

[3]Castelino characterizes this document as "a memo that reduced Dr. Chapman's plagiarism charge, [Dkt. No. 56-13], to 'submitting duplicate work' and recorded informing Dr. Chapman that Justin was not guilty of plaigiarism [sic]." Dkt. No. 237 at 7. But Dr. Chapman did not accuse Castelino of "plagiarism"; he accused him of submitting a response that "contain[ed] an answer nearly identical to another student's work." Dkt. No. 56-13. And Dr. Sutterer did not inform Dr. Chapman that Castelino was "not guilty"; he agreed with Dr. Chapman that Castelino had submitted duplicate work and that doing so was a violation of

occurred, it remains a violation of academic integrity to submit duplicate work," so he did not

ask Dr. Chapman to retract his letter documenting the violation. Dr. Sutterer also "emphasize[d]

to Justin that another occurrence of this type would lead to [Dr. Sutterer] requesting his

dismissal." *Id.*

Throughout Castelino's tenure at Rose-Hulman, many complaints were documented

about his behavior, including numerous instances in which he yelled and cursed at professors and

other staff members.

### C. The Note Sheet Incident

Castelino dropped Dr. Chapman's course ("CE 380") in 2014 and re-enrolled in it in the

Spring 2015 term. In the Spring 2014 term Dr. Chapman had permitted students to use a typed

note sheet for his exams, but he changed his policy in the 2014-2015 school year to require

students to handwrite their note sheets. He made this change because he realized that students

were simply copying and pasting course slides to make their note sheets, and he believed they

would learn more if they were required to handwrite them instead. On April 2, 2015, he

informed his students that their note sheets were to be handwritten for their exam the following

day. Castelino asked Dr. Chapman if he could have an exception to the policy because he

---

academic integrity. And while Castelino argues that Rose-Hulman's "Academic Rules and
Procedures do not define academic misconduct as 'submitting duplicate work,'" Dkt. No. 237 at
7, the Student Handbook states that "Academic Misconduct includes actions such as cheating,
plagiarizing, or interfering with the academic progress of other students," Dkt. No. 56-10 at 53,
and submitting duplicate work is an action "such as" those enumerated. The case cited by
Castelino, *Lawler Mfg. Co. v. Bradley Corp.*, 280 F. App'x 951, 955 (Fed. Cir. 2008), does not
support a different conclusion, as it held that the term "such as" in the contract at issue in that
case "refer[red] to items similar to what are recited rather than indicating that the recited items
are just examples of what is covered by that provision." There is no question that submitting
duplicate work is an act that is similar to cheating and plagiarizing.

wanted to use his typewritten note sheet from the first time he took the course.  He told Dr. Chapman that he had not just copied and pasted the information onto his note sheet.  When Dr. Chapman did not agree to allow him to reuse his typewritten sheet, Castelino discussed the issue with Dr. DeGrange and Dr. Sutterer.[4]  He represented to them that he was not able to handwrite a suitable note sheet because of his disability.  Castelino explained to each of them that he understood the reason for Dr. Chapman's rule change and that his note sheet was typed but did not just contain copied and pasted course slides.  Drs. Chapman, DeGrange, and Sutterer all understood Castelino to mean that none of the information on his note sheet was cut and pasted; Castelino meant that it did not *just* contain cut and pasted information, because he had typed *some* of the information on the sheet himself.

Dr. DeGrange arranged for Castelino to have his note sheet from the previous year transcribed into a handwritten note sheet at the Learning Center on campus.[5]  However, when Castelino arrived at the Learning Center, there was no longer anyone there who could assist him.

---

[4]Castelino asserts that he "applied to Disability Services for help finding tutors who could transcribe his card."  Dkt. No. 237 at 5.  The evidence he cites for this assertion indicates that, at 3:37 p.m., Dr. DeGrange asked Castelino to go to the Learning Center "now" to have his notes handwritten, Dkt. Nos. 56-6 and 56-26, and that when he went there around 4:45 pm. no one was available to help him.  The evidence cited by Rose-Hulman indicates that Castelino asked to be permitted to use his typed note sheet from the previous year and that Dr. DeGrange suggested having the note sheet transcribed by a tutor at the Learning Center as an alternative.  Dkt. Nos. 246-16 and 246-28. Castelino's testimony during his hearing before the Rules and Discipline Committee also suggests that Castelino's request was that he be permitted to use his note sheet from the previous year, and it was Dr. DeGrange who suggested that he go to the Learning Center to have his note sheet transcribed.

[5]Castelino characterizes this as "informing Justin of efforts to provide note taker assistance, and thus, acknowledging Defendant's obligation to provide that assistance" and "promising Justin access to a tutor to transcribe his notes to a single page for use during Dr. Chapman's CE380 exam."  Dkt. No. 237 at 4.  But offering to provide a service to a student is not the same as acknowledging a legal obligation to provide it; a school certainly may go above

Castelino was permitted to use the typed note sheet for the exam. However, the students were required to turn in their note sheets along with their exams, and Dr. Chapman discovered that one side of Castelino's note sheet contained at least 26 copied and pasted course slides. Because of this, Dr. Chapman considered Castelino's use of the note sheet to be academic misconduct and sent a letter to that effect to Castelino. Pursuant to Rose-Hulman policy, Dr. Chapman sent copies of the letter to Dr. Sutterer, Dean of Students Pete Gustafson, and Dean of Faculty Richard Stamper. Castelino received a zero on the exam, which meant that he could not pass the course.

### D. Proceedings Before the Rules and Discipline Committee

Pursuant to Rose-Hulman policy as set forth in its Student Handbook, Castelino had the opportunity to appeal Dr. Chapman's finding of academic misconduct to the Rules and Discipline Committee if he felt that Dr. Chapman had "been unfair or ha[d] imposed a penalty too severe." Dkt. No. 246-26. Dr. Chapman's letter informed Castelino of his right to appeal. Castelino did not immediately appeal Dr. Chapman's decision.

The Student Handbook also provided that "[if] the Dean of Students finds a student involved in more than one instance of Academic Misconduct, the Dean may bring the case to the Institute Rules and Discipline Committee." *Id.* By letter dated April 20, 2015, Dean of Students Gustafson informed the Rules and Discipline Committee that Castelino had accumulated three cases of academic misconduct so that the Committee could "determine if additional sanctions or penalties should be levied against Mr. Castelino." Dkt. No. 246-30. After Castelino was notified

and beyond what is legally required to assist a disabled student without creating a legal obligation.

of the Rules and Discipline Committee's inquiry, he requested and was granted the opportunity to appeal the second and third findings of academic misconduct.[6] Dr. Richard Ditteon, the professor who was the chair of the Committee, scheduled two hearings, one to consider Castelino's appeals and the second to determine what, if any, additional penalties would be imposed if the first hearing resulted in the findings being upheld. However, Castelino decided to drop his request for an appeal, so only the second hearing was held.[7]

Castelino's hearing before the Rules and Discipline Committee was held on May 13, 2015. Due to Castelino's behavior leading up to the hearing, Dr. Ditteon feared that Castelino might become violent and requested the presence of security for the hearing, something which he had never done with any other student. Also during this time, members of the Civil Engineering Department were so concerned for their safety due to Castelino's behavior that they created a

---

[6]Both parties appear to agree that Dr. Ditteon agreed to permit Castelino to appeal both of Dr. Chapman's charges. *See* Dkt. No. 246-2 at 14-15 (citing affidavit of Dr. Ditteon); Dkt. No. 291 at 26 (quoting same). Indeed, Castelino describes a document in his index of exhibits as "Dr. Ditteon allow J to appeal two at once." Dkt. No. 237-1 at 3 (describing Dkt. No. 56-33.) This is curious, inasmuch as that exhibit contains an email from Dr. Ditteon to Castelino in which Dr. Ditteon states that he will permit an appeal of Dr. Chapman's second charge, but that Castelino's "request for an appeal of Dr. Chapman's first charge of academic misconduct is denied." Dkt. No. 56-33. Perhaps Dr. Ditteon later changed his mind. In any event, Castelino does not dispute this factual assertion, which is supported by Dr. Ditteon's affidavit.

[7]Rose-Hulman asserts that the first hearing was cancelled because "[o]n May 8, 2015, Castelino decided to drop his request for an appeal and proceed with only one hearing." Dkt. No. 246-2 at 15. The only evidence Rose-Hulman cites to for this assertion is the affidavit of Dr. Ditteon, which states: "On May 8, 2015, I was informed that Castelino decided to drop his request for an appeal of Dr. Chapman's findings of academic misconduct and have only one hearing." Dkt. No. 246-31 ¶ 12. Castelino correctly points out that this statement is hearsay with regard to the fact that Castelino decided to drop his request for an appeal. However, Castelino does not dispute the fact that Castelino "requested that Dr. Ditteon cancel the first hearing and proceed with only one hearing." Dkt. No. 291 at 26.

code word to use with Rose-Hulman's public safety office if they felt they needed assistance during an encounter with Castelino.

Castelino asked to have an attorney present for the hearing, but the request was denied. He selected Professor Clifford Grigg as an advisor for the process, and Dr. Grigg was present for the hearing. Castelino was permitted to provide testimony, witnesses, and evidence at the hearing. Dr. Chapman testified at the hearing that Castelino told him that the note sheet he wanted to use did not contain any copy and pasted slides. Dr. Sutterer testified that Castelino told him that he understood that he was not permitted to use the power point slides and that he had a typed note sheet that he wanted to use. Castelino's fiancé testified that she was present for Castelino's conversation with Dr. Chapman about his note sheet prior to the exam and that Castelino told Dr. Chapman that he did not just copy and paste the information on the sheet. Castelino suggested that what he told Dr. Chapman and Dr. Sutterer was that he did not "just" copy and paste the information, by which he meant that he had typed some, but not all, of the information. Dr. Sutterer testified that the clear import of the conversation was that Castelino understood that copied powerpoint slides were not to be used. After considering the evidence, the Committee found Castelino responsible for repeated acts of academic misconduct and voted to suspend him for one quarter. Castelino was informed that he could finish the current quarter and then petition for readmission for the winter quarter of 2015-16.

### E. Post-Suspension Events

Castelino appealed his suspension to the faculty. Dr. James Conwell, President of Rose-Hulman, met with Castelino to discuss the procedure for the appeal hearing. Castelino became angry during the meeting and began yelling at Dr. Conwell, accusing him of configuring the hearing in an unfair manner. After repeatedly asking Castelino to calm down, Dr. Conwell

finally asked him to leave his office and instructed him not to have any further in-person contact with his office.

In conjunction with his appeal, Castelino was permitted to address the faculty in person and submit a written letter setting out his position. The faculty upheld his suspension.

Castelino did not reapply for admission for the 2015-16 winter quarter, but he did reapply for the following quarter, spring 2016. Dean Erik Hayes reviewed the letter sent by Castelino seeking readmittance and recommended to the Admissions and Standing Committee that readmission be denied because he believed that Castelino's letter indicated that he still did not take responsibility for his actions. On March 6, 2016, Castelino appeared before the Admissions and Standing Committee. During the readmission hearing, Castelino claimed that the incidents of academic misconduct were caused by breakdowns in communication. Castelino was unable to tell the Committee members what courses he would take in the spring quarter, but stated that Dr. Sutterer had told him that they would figure that out if he were to be readmitted. The Committee determined that enrolling for the spring quarter would provide no added benefit over waiting for the fall quarter, given the courses Castelino needed to graduate and when those courses were offered. The Committee voted to deny Castelino readmission for the spring 2016 quarter.

Shortly after this hearing, Rose-Hulman learned of an incident that had occurred in July 2015, two months after Castelino had been suspended from Rose-Hulman. According to newspaper article, which Dr. Sutterer found by searching Castelino's name on the internet, Castelino was arrested in Connecticut for breach of peace, cultivation of marijuana, possession of more than four ounces of marijuana, sales of marijuana, possession of a hallucinogen, operation of a drug factory, and conspiracy to commit each offense. The article further reported that the arrest was precipitated by a call to police reporting that a man was choking a woman in a

pickup truck. On March 24, 2016, Rose-Hulman obtained records regarding Castelino's criminal history that showed that he had pled guilty to forgery in 2007, pled guilty to property damage/injury in May 2010, for which he served six months in jail, and pled guilty to operating a motor vehicle under the influence of alcohol or drugs in July 2010.

On June 2, 2016, Castelino applied for admission for the 2016 fall quarter. A hearing was held before the Admissions and Standing Committee on June 10, 2016. The Committee asked Castelino about the July 2015 incident, and he stated that he had "a disagreement with his fiancée and she had 'stuff' on her, so they were arrested. When asked if he was choking his fiancée, Castelino stated there were no choking charges, only drug related charges." Dkt. No. 246-8 ¶ 24. He further claimed that he was a confidential informant, that the newspaper article was part of the cover up of that fact, and that "the police seized 'a bunch of random stuff' throughout his house to make the case look real." *Id.* ¶ 25.

Dr. Conwell expressed his opinion to the Committee that Castelino posed a safety risk to the Rose-Hulman community. The Committee voted to deny his admission request, and Castelino was informed that he would not be permitted to reapply.

### III. <u>DISCUSSION</u>

Castelino asserts the following claims in his Amended Complaint: (1) violation of the Americans with Disabilities Act; (2) breach of contract; (3) defamation; (4) false advertising; (5) invasion of privacy; (6) harassment; and (7) malice. Each party moves for summary judgment on all of Castelino's claims. Each claim will be addressed, in turn, below.

As an initial matter, the Court notes that its consideration of the pending motions has been hindered by the manner in which Castelino briefed his own motion and his opposition to Rose-Hulman's motion. While Castelino points to a large number of exhibits throughout his

briefs, he often fails to articulate in any coherent manner how he believes those exhibits, coupled

with the applicable law, demonstrate that he is entitled to (or Rose-Hulman is not entitled to)

summary judgment on an issue.  In addition, while his briefs are divided into sections, it is often

unclear how some of the evidence and arguments contained in a section relate to the purported

topic of that section.  While the Court has endeavored to address each of the arguments made by

Castelino, "'[i]t is not the obligation of the court to research and construct the legal arguments

open to parties, especially when they are represented by counsel.'" *Riley v. City of Kokomo*, 909

F.3d 182, 190 (7th Cir. 2018) (quoting *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 408-09 (7th

Cir. 1988), and citing *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th

Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported

by legal authority.")).

### A.  Violation of Americans with Disabilities Act

In Count I of his Amended Complaint, Castelino asserts a claim for violation of Title III

of the Americans with Disabilities Act ("ADA"),[8] which provides that "[n]o individual shall be

---

[8]As an initial matter, the Court notes that while Castelino seeks both injunctive relief and monetary damages for this claim in his Amended Complaint, only injunctive relief is available for a violation of Title III of the ADA.  *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1075 (7th Cir. 2013); *see also Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 86 (2d Cir. 2004), *opinion corrected,* 511 F.3d 238 (2d Cir. 2004) ("Monetary relief, however, is not available to private individuals under Title III of the ADA. 42 U.S.C. § 12188(a)(1) (same remedies available under Title III of ADA as under Title II of Civil Rights Act of 1964). A private individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages. *See Newman v. Piggie Park Enters.*, *Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) (only injunctive relief available as remedy for violation of Title II of Civil Rights Act of 1964).").  After he filed his Amended Complaint, however, Castelino decided not to seek reinstatement to Rose-Hulman, *see* Dkt. No. 291 at 32 (noting that Castelino "has decided not to go back to Rose-Hulman"), which has mooted much of the injunctive relief he sought.  However, he still seeks injunctive relief relating to the notation on his Rose-Hulman transcript regarding his suspension, so his ADA claim is not moot, and the Court has jurisdiction to consider it.

discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who . . . operates a place of public accommodation." 42 U.S.C. § 12182(a). There is no question that Rose-Hulman is a place of public accommodation as defined by the ADA. *See* 42 U.S.C. § 12181(7)(J) (undergraduate private school is a public accommodation). Although, as noted above, Castelino's briefs do not present his arguments in the most straightforward manner, the section of Castelino's brief in support of his own motion for summary judgment that relates to the ADA contains a subsection within his statement of undisputed facts entitled "The Defendant did not accommodate [Castelino's] disability" (hereinafter referred to as the "ADA Fact Section"). Dkt. No. 237 at 5. "Discrimination" is specifically defined in Title III of the ADA to include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12181(2)(A)(ii). Therefore, the Court will start there.

In the ADA Fact Section, Castelino discusses several actions by Rose-Hulman faculty. First, he asserts that "[f]or one exam Dr. James Hanson deprived [Castelino] of double time and a distraction-free environment." Dkt. No. 237 at 5. However, the statute of limitations for a Title III ADA claim brought in Indiana is two years, *see Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1075 (7th Cir. 2013) (relevant state's statute of limitation for personal injury cases applies to Title III ADA cases); Ind. Code § 34-11-2-4(a)(1) (two-year statute of limitations for "injury to

person or character"),[9] and the record makes clear that Dr. Hanson was Castelino's professor in 2013, more than two years before March 28, 2017, the date this case was filed. Thus, Rose-Hulman is correct that Castelino's ADA claim is time barred to the extent it that it is based on this and any other discrete event that occurred more than two years before this case was filed.[10]

---

[9]Castelino, citing *Jones v. R.R. Donnelley & Sons, Co.*, 541 U.S. 369 (2004), argues that the four-year catch-all statute of limitations for federal claims found in 28 U.S.C. § 1658 applies to his ADA claim. Castelino is correct that the Court held in *Jones* that Section 1658 applies to claims that are "made possible by" a statute that was enacted after December 1, 1990, and also claims that were made possible by a post-1990 amendment to an existing statute. The relevant provision of the ADA was enacted on July 26, 1990, and while Castelino is correct that the ADA has been amended since 1990, he fails to articulate how those amendments made his ADA claim possible. They did not. In other words, while some claims under the ADA are subject to Section 1658 because they would not have existed but for the amendment to the statute, Castelino's claims do not fall into that category.

[10]To the extent that Castelino suggests that the date his complaint before the Indiana Civil Rights Commission ("ICRC") was filed is relevant to the statute of limitations issue, *see* Dkt. No. 291 at 3 ("Justin began his suit before the Indiana Civil Rights Commission on June 22, 2015, which was . . . less than two years after Dr. Hanson last taught him.") (record citation omitted), he is incorrect. A plaintiff is not required to exhaust administrative remedies prior to filing a Title III ADA action. *See Stan v. Wal-Mart Stores, Inc.*, 111 F. Supp. 2d 119, 123 (N.D.N.Y. 2000) ("Title III of the ADA incorporates 42 U.S.C. § 2000a-3(a) only; not 2000a-3(c). *See* 42 U.S.C. § 12188(a)(1). Because § 2000a-3(c) contains the exhaustion requirement, but was not incorporated into the ADA, the ADA does not mandate exhaustion prior to commencing suit."). Castelino's choice to pursue non-mandatory state administrative remedies before filing his lawsuit is simply not relevant to the question of whether his lawsuit was timely filed. Also incorrect is Castelino's suggestion that his ADA claim did not accrue until he was told that he would not be permitted to reapply to Rose-Hulman. "*Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), and its progeny in this circuit dictate that discovery of the original act of discrimination, *not* future confirmation of the injury or determination that the injury is unlawful, is when the statute of limitations begins to run." *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d 547, 551 (7th Cir. 1996).

> Put another way, "[t]ime starts to run with 'the *discriminatory act,* not the point at which the *consequences* of the act become painful.'" *Lever v. Northwestern Univ.,* 979 F.2d 552, 553 (7th Cir. 1992) (emphasis in original, quoting *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981); *see also Conner v. Reckitt & Colman, Inc.*, 84 F.3d 1100, 1102 (8th Cir. 1996) (statute of limitations for ADA claim begins to run at time of discriminatory act, not when act's consequences become most painful); *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 449-50 (7th Cir. 1990) (statute of limitations in age discrimination in employment case began to run

This includes Rose-Hulman's requirement that his disability be certified within three years of his enrollment and the 2014 finding of academic misconduct for "submitting duplicate work," both of which are also mentioned in Castelino's ADA Fact Section.[11]

The bulk of the facts contained in the ADA Fact Section relate to the note sheet incident in Dr. Chapman's class. Castelino argues that "[b]y enforcing a new rule on handwritten notes with one day's notice, and complaining when [Castelino's] note card contained printed graphs, Dr. Chapman denied [Castelino] an accommodation that would make his educational opportunity as effective as that provided to others." Dkt. No. 237 at 12. But Castelino points to no evidence that the accommodation that was provided by Rose-Hulman—the opportunity to use a typed note sheet that did not contain cut and pasted material—was not a reasonable accommodation for his disability. In fact, nowhere in his summary judgment briefs does Castelino articulate why he believes that Rose-Hulman was obligated to allow him to use his note sheet from the previous

---

when plaintiff discovered injury, not date on which "full consequences of action" became clear).

*Id.* at 552.

[11]Castelino mentions numerous other ways in which he, at least implicitly, alleges that Rose-Hulman failed to accommodate his disability. For example, in his reply brief in support of his motion for summary judgment, Castelino states that "it was unreasonable for Dr. Chapman to deduct 20 points from the score on one of [Castelino's] assignments because he turned it in late." Dkt. No. 291 at 13. Castelino fails to articulate why this was unreasonable or how his late assignment related to his disability. Similarly, he mentions the lack of tutors at Rose-Hulman for upper level classes as a source of discrimination, Dkt. No. 291 (Rose-Hulman "correctly states that [Castelino] alleges discrimination because Rose-Hulman failed to provide tutors"), but fails to articulate how this constituted a denial of a reasonable accommodation for his disability, especially in light of the availability of help directly from his professors. As noted above, "[i]t is not this court's responsibility to research and construct the parties' arguments," *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011), and the Court is unable to consider these and the other allegations for which Castelino provides no cogent argument. *See also Schaefer*, 839 F.3d at 607 ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

year with its cut and pasted material; in other words, he fails to explain how his disability impacted his ability to create a new note sheet that did not contain material that had been cut and pasted.[12]  Therefore, Castelino has failed to demonstrate that a reasonable jury could rule in his favor on his claim that Rose-Hulman violated the ADA with regard to his use of the note sheet.

It is unclear whether Castelino argues that Rose-Hulman's decision to suspend him and/or the decision not to readmit him were themselves discriminatory, or whether he argues only that those decisions violated the ADA because they were based on Dr. Chapman's misconduct charge against him for his use of the note sheet which, as discussed above, he asserts was caused by the failure to accommodate his disability.  His briefs seem to contradict themselves on this issue.   Castelino argues

> When the Defendant, by Discipline, found Justin guilty of three academic misconducts in the same hearing . . . including Dr. Sutterer's lesser included offense . . . it relied on standards or criteria that *had the effect of* discriminating against Justin's disability and perpetuated Dr. Chapman's discrimination while he was subject to common administrative control. These acts violated 42 USC § 12181(b)(i)(D).  The ADA prohibits "failure to make reasonable modifications in policies, practices, or procedures . . . to afford such goods, services . . . advantages, or accommodations to individuals with disabilities . . . " unless relevant officials first consider other means, their feasibility, cost and effect on its program, and come to a rationally justifiable conclusion that the alternatives would either lower academic standards or require substantial program alteration. 42 USC §12182(b)(2)(A)(ii); Wynne v. Tufts U. School of Medicine, 932 F.2d

---

[12]Castelino argues that Dr. Chapman "admitted he intentionally failed to give students timely or sufficient notice of the new policy so they could conform to it before upcoming examinations."  Dkt. No. 237 at 10.  The evidence cited in support of this assertion does not indicate that Dr. Chapman omitted the new note sheet policy from his syllabus intentionally, only that it was omitted.  Castelino also argues that "Enforcing a new policy on one day's notice violated 42 U.S.C. §§12182(a), (b)(1)(C) and (D), (b)(2)(A)(i); Guckenberger, supra."  *Id.*  The case cited, *Guckenberger v. Bos. Univ.*, 974 F. Supp. 106 (D. Mass. 1997), does not stand for the proposition that *any* policy change on short (or even no) notice violates the ADA.  The question is whether, given all of the circumstances, the new policy as applied to Castelino—the requirement of a note sheet that did not contain material that was cut and pasted—resulted in Castelino being denied a reasonable accommodation that he required due to his disability.

> 19, 26 (1st Cir. 1991).  This Defendant has yet to document, or even allege, any of that. Each and every time before that determination that the Defendant by its faculty or staff denied Justin accommodations or held him to a standard expected from more able students it violated 42 USC §12182(b)(i)(A)(1), b(i)(D)...

Dkt. No. 237 at 13; *see also* Dkt. No. 237 at 12 ("Knowing of [Castelino's] disabilities . . . Dr. Chapman denied him a reasonable accommodation and the chance to participate in or benefit from the CE380 course, an advantage the Defendant offered others.  This violated 42 U.S.C. § 12182(b)(1)(A)(1).  The Defendant perpetuated Dr. Chapman's discrimination by suspending [Castelino] in reliance on it."); Dkt. No. 291 at 28 ("In disciplining [Castelino] for academic misconduct, the Defendant violated the ADA by perpetuating Dr. Chapman's illegal discrimination."); Dkt. No 264 at 2 (describing ADA claim as failure to accommodate); *id.* at 8 (stating that Castelino did not sue because Rose-Hulman failed to readmit him; "[he] sued because, in order to suspend him, [Rose-Hulman] denied his ADA accommodations and broke its contract with him."); *id.* at 11 ("And [Castelino] didn't sue Rose-Hulman for refusing to re-admit him.  He sued because Rose-Hulman denied accommodations guaranteed to him by the ADA without the required individualized assessment, and then, without determining him to be an immediate threat and by ignoring its own rules of procedure, it suspended him because he didn't and couldn't behave as though he were not disabled."); Dkt. No. 291 at 34 (same); *id.* at 37 ("Castelino originally sued because the procedures that resulted in that suspension were unfair and a breach of contract and the academic misconduct charges against him resulted from violations of the ADA. . . .  The arrest in question occurred after and as a result of the suspension; if Justin hadn't been suspended, he would never have been in Connecticut to get arrested.  If the Defendant had accommodated his disability in reasonable ways, there would have been no grounds to suspend him and no "'additional information to conclude he was a

threat to the campus community.'"); *but see* Dkt. No. 264 at 11-12 (consideration of arrest absent

conviction in deciding not to readmit Castelino constituted discrimination and violated the

ADA); *id.* at 16 (by considering the arrest, Rose-Hulman "provided [Castelino] with a hearing

that was different from those it offered the public in ways that did not make the hearing as

effective as that provided to others" and "applied standards, criteria or methods of administration

which effectively discriminated against [Castelino] on the basis of disability" in violation of the

ADA); *id.* at 21 ("By taking the post suspension arrest-without-conviction issue to a committee

without the authority to consider it, while it exercised its proper authority and considered Justin's

readmission, Drs. Conwell and Hayes applied standards, criteria and methods of administration

which effectively discriminated against Justin on the basis of disability and perpetuated Dr.

Chapman's discrimination while they were all subject to common administrative control," in

violation of the ADA); Dkt. No. 291 at 35 (same); Dkt. No. 264 ("[Castelino] has never said he

was suspended for exercising his right to accommodations. He complains that he was denied

accommodations in ways that enabled faculty to charge him with misconduct, and that the

Defendant's method of administration with respect to those charges breached its contract with

him.  As a private university, the Defendant could not legally offer Justin a service, facility,

privilege, advantage, accommodation or opportunity different from those it offered the public

unless the difference made the service, facility, et cetera ***as effective as*** that provided to others.

42 U.S.C. § 12182(a); §12182(b)(1)(A) (iii). Its standards, criteria or methods of administration

could not effectively discriminate on the basis of disability or perpetuate the discrimination of

others who were subject to common administrative control. 42 U.S.C. 12182(b)(1)(D).")

(emphasis in original).

In any event, Castelino fails to articulate how the standards and criteria used by Rose-Hulman or any of the procedural irregularities that he alleges occurred had the effect of discriminating against Castelino *on the basis of his disability*.  It is not enough to say incorrect procedures were used; to constitute discrimination under the ADA, those incorrect procedures had to be used because of Castelino's disability.  Barring that, Castelino must be able to show that the allegedly incorrect standards or procedures used adversely affected Castelino in a way that they would not have adversely affected a person without a disability.  *See A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 592-93 (7th Cir. 2018) ("Thus, we have recognized that disability discrimination under . . . the ADA can be established in three different ways: '(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people.'" (quoting *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999)).  Castelino fails to do so.

Castelino further asserts that

> Drs. Chapman and Sutterer applied standards to Justin that had the effect of discriminating against him on the basis of his disability. See especially DD ##9,[13] 24 through 26,[14] Dckt #56-9, 27 through 29.[15] This violated 42 USC

---

[13]This exhibit contains a series of email exchanges in 2014 between Castelino's mother and Dr. Sutterer and Castelino and Dr. Sutterer regarding Castelino's need for more assistance from faculty in courses in which tutors were not available.

[14]These exhibits relate to the note sheet incident.

[15]Exhibit 27, Dkt. No. 56-30, is an email from Castelino in which he denies lying with regard to the note sheet and states that the charge against him constitutes harassment and discrimination against him as a student with disabilities.  Exhibit 28, which was filed manually, appears to be a screenshot from the website lawyers.com that shows that Dr. Chapman is an attorney.  Exhibit 29, Dkt. No. 56-31, is an email from Dr. Ditteon informing Castelino that he is calling a meeting of the Rules and Discipline Committee to discuss possible disciplinary action for his three charges of academic misconduct and attempting to schedule the meeting.

> §12182(b)(1)(D)(i) and (ii). Collectively, DD #9, 10,[16] 17,[17] 24-26, 29-31,[18] 33,[19] 34,[20] 37[21] and 40[22] list important privileges and advantages which the Defendant provided other individuals and denied to Justin in violation of 42 USC § 12182(b)(1)(A)(iii).

Dkt. No. 237 at 15. While elsewhere in his briefs Castelino provides more detail regarding how he believes Rose-Hulman violated its own procedures with regard to his misconduct charges, nowhere does he articulate how those alleged violations ran afoul of the ADA. In other words, he does not explain how the failure to follow certain procedures had the effect of discriminating against him on the basis of disability or of perpetuating discrimination based on disability. *Cf. Packer v. Trustees of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 852 (7th Cir. 2015) ("The problem, though, is that Packer's abbreviated analysis of the claim made no effort to weave such evidence into a cogent argument, grounded in the case law, as to why a factfinder might be able to [find in her favor].") Nor does he point to evidence that Rose-Hulman handled situations in which non-disabled students were charged with multiple acts of misconduct differently or evidence that suggests that Rose-Hulman decided to violate its own procedures regarding the

---

[16]This exhibit, found at Dkt. No. 56-10, is the Rose-Hulman Student Handbook.

[17]This exhibit, found at Dkt. Nos. 56-16 through 56-21, consists of various Rose-Hulman rules and procedures.

[18]Although it is not clear from the exhibit itself, Castelino identifies Exhibit No. 30, found at Dkt. No. 56-32, as "exchange with Dr. Hayes re: procedure." Exhibit No. 31, found at Dkt. No. 56-33, is the email exchange discussed above in which Dr. Ditteon denies Castelino's request to appeal Dr. Chapman's first charge of misconduct, grants his request to appeal Dr. Chapman's second charge, and seeks to schedule a hearing on that appeal.

[19]This exhibit, found at Dkt. No. 56-35, is an email exchange in which Dr. Ditteon informs Castelino that he was found guilty of each of the misconduct charges against him.

[20]This exhibit, found at Dkt. No. 56-36, is the letter informing Castelino of his suspension.

[21]This exhibit, found at Dkt. Nos. 56-39 through 56-42, consists of Rose-Hulman's narrative response to Castelino's complaint before the ICRC.

[22]This exhibit, found at Dkt. No. 126-12, is Rose-Hulman's Policy for Civil Rights Equity.

misconduct charges against Castelino because of Castelino's disability.  Therefore, he has failed to point to evidence from which a reasonable jury could determine that the manner in which Rose-Hulman handled the misconduct charges against him violated the ADA.

The ADA Fact Section also contains the following:

> On March 7, 2016 the Admissions and Standing Committee (hereinafter, "Admissions") denied Justin's application for readmission, saying, "The Committee recommends that, if you decide to request re-admission for the fall, you be prepared to provide a course plan for the fall quarter through completion of your degree requirements."

Dkt. No. 237 at 8 (record citations omitted). In the argument section that follows, Castelino then describes his first readmission hearing as "testing the memory of a man whose issues with registration and recall were documented" and asserts that two members of the committee "spoke on the record and used [Castelino's] disabilities against him." *Id.* at 17.  He then asserts that this "would never have happened" if Rose-Hulman had complied with its own rules and appointed Jan Pink chair *pro tempore* of the committee,"[23] an assertion he bases on his assertion that "Ms. Pink came to [Castelino's] defense during Dr. Hanson's copying charge." *Id.* at 16.  It is not clear to the Court why Castelino believes the result of the March 2016 hearing would have been different had Pink acted as chair, and he points to no evidence that supports his speculative assertion that that would be the case.[24]

_____

[23]The Court surmises that the regular chair of the committee was injured and was unable to attend the hearing.

[24]In support of his assertion that Pink "came to his defense" during the hearing regarding "Dr. Hanson's copying charge," Castelino cites to the recordings of that hearing, which he designates as DD#64 and 65. Dkt. No. 237 at 16.  Those recordings are incomplete (as Castelino recognizes elsewhere in his brief, *id.* at 24) and do not appear to contain any statements by Pink. However, assuming that Castelino is correct that Pink "came to his defense" during that hearing, it is simply not reasonable to infer from that fact that she would have somehow altered the result of the March 2016 hearing had she acted as chair at that hearing.

The ADA Fact Section also states that Rose-Hulman "declared to the [ICRC] that it denied [Castelino] the right to re-apply because of his 'threatening behaviors toward other students, faculty, and administrators and his criminal activities that occurred in July 2015, shortly after his suspension from Rose-Hulman.' Dr. Graves told [Castelino] of the decision without explaining it." Dkt. No. 237 at 7-8 (record citations omitted). In the argument section that follows, Castelino asserts that the "documented acts of aggression" pointed to by Rose-Hulman in its filing before the [ICRC] occurred "in the months leading up to his suspension in May 2015," and argues that

> [t]hose months led up to [Castelino's] final exams for Spring Quarter. This is precisely when anyone with normal psychological functioning would become more easily frustrated, and [Castelino] has a documented impulse control problem. Those allegedly documented acts resulted from Defendant's ignoring the disorder the law obligated it to accommodate.

Dkt. No. 237 at 9. It is not entirely clear what Castelino means by this, and he does not elaborate. To the extent that Castelino is arguing that Rose-Hulman was required to accommodate his disability by permitting him to commit acts of aggression without consequence, that argument is wholly meritless. Also without merit is Castelino's insistence throughout his brief that Rose-Hulman could not take action based on any threatening behavior by Castelino without first engaging in the individualized assessment required by 28 C.F.R. § 36.208,[25] which provides:

> (a) This part does not require a public accommodation to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of that public accommodation when that individual poses a direct threat to the health or safety of others.

_____

[25]Both parties incorrectly cite to 28 C.F.R. § 35.139, which applies to public entities, rather than the identical regulation that applies to public accommodations such as Rose-Hulman.

> (b) In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 36.208.  As the Seventh Circuit has held in the employee context,

> As a number of courts have recognized, when an employee's disability has actually resulted in conduct that is intolerable in the workplace, the direct-threat defense does not apply: the case is no longer about potential but rather actual dangers that an employee's disability poses to herself and others.  *See Mayo*, 795 F.3d at 945;  *Sista v. CDC Ixis N.A., Inc.*, 445 F.3d 161, 170-71 (2d Cir. 2006); *Sper v. Judson Care Ctr., Inc.*, 29 F.Supp.3d 1102, 1112-13 (S.D. Oh. 2014).  Put another way, what is at issue once an employee has engaged in threatening behavior is not the employer's qualification standards and selection criteria and whether they tend to screen out people with disabilities, *see* 42 U.S.C. § 12113(a), but whether the employer must tolerate threatening (and unacceptable) behavior because it results from the employee's disability.

*Felix v. Wisconsin Dep't of Transportation*, 828 F.3d 560, 571 (7th Cir. 2016).  Castelino is simply wrong when he argues that Rose-Hulman bears the burden of proving a direct threat defense in this case.[26]  Just as "an employer may, consistent with the ADA . . . terminate an employee for inappropriate behavior even when that behavior is precipitated by the employee's disability," *id.* at 574 (citing *Palmer v. Circuit Court of Cook Cty., Ill.*, 117 F.3d 351 (7th Cir. 1997) and *Brumfield v. City of Chicago*, 735 F.3d 619, 631 (7th Cir. 2013)), so, too, was Rose-Hulman permitted to consider Castelino's past behavior when determining whether to readmit

---

[26]The Court notes that Rose-Hulman asserted as a defense that it was not required to permit Castelino from participating in its services, etc., because he "is a direct threat to the Rose-Hulman campus community and poses a threat to the safety of the members of the campus community," Dkt. No. 90 at 25, and at least implicitly acquiesces in Castelino's assertion that it was required to undergo an individualized assessment of the threat posed by Castelino.  This does not alter the applicable law, however.

him, even if that past behavior may have been caused, in whole or in part, by Castelino's disability.

Finally, the ADA Fact Section notes the fact that Rose-Hulman's on-line admissions application requires applicants to reveal only if they have been convicted of a felony. In the argument section, Castelino argues that Rose-Hulman discriminated against him "by considering any post-suspension arrest at all without proof of conviction." Dkt. No. 237 at 18. Castelino then continues: "What motivates this discrimination? The only evidence of any difference between Justin and other students, DD #47, and other applicants, DD #41, is his disability, DD ## 1 and 2." But the evidence cited by Castelino simply does not support this assertion. "DD #47" refers to Dkt. No. 80-4, which contains information about several Rose-Hulman students who were charged with crimes:[27] (1) William Bentle, who reportedly was charged in May 2015 with various misdemeanors and felonies arising out of an automobile accident on campus that resulted in injuries to several people and who was enrolled as a Rose-Hulman student in the fall of 2016; (2) Austin Templin, who reportedly was arrested in March 2002 for producing and selling fake IDs, and who was enrolled as a Rose-Hulman student in the winter of 2004; (3) Michael Bostic, who reportedly was arrested in December 2011 for striking two police officers who asked him to leave a fraternity party, and who was enrolled at Rose-Hulman in Winter 2013; and (4) an unnamed student who in the summer of 2007 told his roommate that he had "punched one or more cops in the face (without being provoked) and was court ordered to stay in Indiana for some period of time" and who, as far as the roommate was aware, was not

---

[27]This exhibit also contains course schedules for a student named Peter Antley, although there does not appear to be accompanying arrest information about him.

disciplined by Rose-Hulman and eventually graduated from Rose-Hulman. "DD #41" refers to Dkt. No. 126-7, which is the affidavit of Kayla Pollock that does not seem relevant to the issue at hand in any way. Perhaps Castelino intended to refer to Dkt. No. 126-6, which consists of screen shots that show that Rose-Hulman asked applicants about convictions, not arrests. "DD#1" and "DD#2" refer to documentation of Castelino's disability. Putting aside the hearsay nature of much of this "evidence," the most that a reasonable factfinder could conclude from the evidence cited by Castelino is that on some occasions, under some unknown circumstances, Rose-Hulman has permitted students who were arrested to remain at Rose-Hulman or return after a suspension. There is no evidence in these documents from which the factfinder could compare the circumstances under which Rose-Hulman made the determination to readmit (or not suspend) the other students. There is no evidence regarding who the relevant decisionmakers were; indeed, for some of the students there is no evidence that Rose-Hulman knew about the arrest. There is also no evidence that the other students did not have a disability. There certainly is no evidence that the students, like Castelino, had convictions prior to the arrests in question, or that they had exhibited the type of aggressive behavior on campus that Castelino had exhibited. The Court is not "obligated in considering a motion for summary judgment to assume the truth of a nonmovant's conclusory allegations on faith or to scour the record to unearth material factual disputes.'" *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 722-23 (7th Cir. 2018) (quoting *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th Cir. 1998)). Castelino has not pointed to evidence from

which a reasonable factfinder could conclude that Rose-Hulman decided not to readmit him because of his disability. [28]

Finally, Castelino suggests that the decision not to readmit him was made in retaliation for his complaint before the ICRC. *See* Dkt. No. 237 at 19 ("What changed between March 7, 2016, and June 10, 2016? On May 17, 2016, Justin's administrative law counsel announced that he would pursue his claim against Rose Hulman. But retaliation is also illegal. Title 42 USC §12203; 28 CFR §35.134.") (record citations omitted). However, Castelino points to no evidence that Rose-Hulman was aware of the May 17, 2016, letter to which he cites; that letter is addressed to the ICRC, not to Rose-Hulman, and does not indicate that Rose-Hulman was copied. Castelino cites to another letter in his response to Rose-Hulman's motion for summary judgment, this one dated March 8, 2016, and addressed to Rose-Hulman, in which the lawyer who was representing Castelino regarding his complaint against Rose-Hulman before the ICRC discusses the preservation of electronically stored information. *See* Dkt. No. 264 at 17 (citing Dkt. No. 264-11). However, that letter's reference to Castelino's ICRC complaint presumably refers to the complaint Castelino filed in June 2015, to which Rose-Hulman responded in July 2015. *See* Dkt. Nos. 111-5 and 111-7 Nothing in the March 2016 letter suggests that Castelino

---

[28]Castelino seems to have abandoned this argument in any event. In his reply brief, Castelino states the following with regard to the evidence about other students who were arrested:

> This was an attempt to prove one aspect of the Defendant's discrimination, which is to say, unequal treatment, in an effort to persuade the Court to overturn his suspension. But since offering this evidence, Justin has decided not to go back to Rose-Hulman so the purpose to be served by this evidence and winning this argument is moot.

Dkt. No. 291 at 32.

had filed or anticipated filing a new complaint. In any event, Castelino has failed to point to evidence from which a reasonable factfinder could find in his favor on a retaliation claim. Rose-Hulman has provided evidence that Dr. Conwell learned of Castelino's arrest during his suspension, as well as his criminal record prior to his enrollment at Rose-Hulman, after March 6, 2018, and that it was that information, combined with the incidents of aggressive behavior toward his professors and others on campus, that led Dr. Conwell to determine that Castelino posed a safety risk and should not be readmitted. Dkt. No. 246-7 at 2. And even assuming that Dr. Conwell was aware of Castelino's intent to file a new ICRC complaint when the decision not to readmit him was made, that, alone, is not sufficient to support a claim for retaliation. *See, e.g.*, *Burks v. Wisconsin Dept. of Trans.*, 464 F.3d 744, 758-59 (7th Cir. 2006) (explaining that "suspicious timing alone . . . does not support a reasonable inference of retaliation" because the "mere fact that one event preceded another does nothing to prove that the first event caused the second" (internal citation omitted)). In any event, as cited above, Castelino states numerous times in his briefs that he is not suing for Rose-Hulman's ultimate refusal to readmit him, so whether that decision about which he is not suing was retaliatory is irrelevant.

As set forth above, the Court finds that Castelino has not, either in conjunction with his own motion for summary judgment or in his response to Rose-Hulman's motion for summary judgment, pointed to evidence of record from which a reasonable factfinder could find in his favor on any of his claims under the ADA. Accordingly, Castelino's motion for summary judgment is denied and Rose-Hulman's motion for summary judgment is granted with regard to those claims.

## B. Breach of Contract

Castelino's breach of contract claim is based on numerous ways in which he asserts that Rose-Hulman's treatment of him violated its own policies and procedures, as set forth in its Student Handbook, Administrative Rules and Procedures, its Policy for Civil Rights Equity, and its Faculty Handbook. *See* Dkt. No. 264 at 3 (listing citations to the relevant terms of the contract as alleged by Castelino). In his opening brief, Castelino's overarching argument is that these documents created an express contract between him and Rose-Hulman and that any failure by Rose-Hulman to comply fully with the policies and procedures set forth within them constituted a breach of that contract. That is incorrect as a matter of law.

Under Indiana law, the relationship between a student and an institute of higher learning is characterized as one of implied contract, not express contract as asserted by Castelino. *Amaya v. Brater*, 981 N.E.2d 1235, 1240 (Ind. Ct. App. 2013) (citing *Neel v. Indiana University Board of Trustees,* 435 N.E.2d 607, 610 (Ind. Ct. App. 1982)). "The terms of the contract, however, are rarely delineated, nor do the courts apply contract law rigidly. It is generally well accepted that the catalogues, bulletins, circulars, and regulations of a university made available to the matriculant become of part of the contract." *Id.* (citations omitted).

> Indiana courts have taken a very flexible approach to the scope of contractual promises between students and universities and have noted that hornbook rules cannot be "applied mechanically where the principal is an educational institution" and the result would be to override an academic determination. *Neel,* 435 N.E.2d. at 611 (citations omitted). Indeed, "[b]ecause such determinations rest in most cases upon the subjective professional judgment of trained educators, the courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." *Id.* Accordingly, although an implied contract exists between the student and the university, the nature of the terms vary:
>
> > In the area of academic services, the courts' approach has been similar to that used with contracts conditioned upon the

> satisfaction of one party. The university requires that the
> student's academic performance be satisfactory to the university
> in its honest judgment. Absent a showing of bad faith on the part
> of the university or a professor, the court will not interfere. The
> good faith judgment model both maximizes academic freedom
> and provides an acceptable approximation of the educational
> expectations of the parties.

> *Id; Gordon v. Purdue Univ.,* 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007).

> In this context, "bad faith is not simply bad judgment or negligence [, r]ather,
> it implies the conscious doing of a wrong because of dishonest purpose or
> moral obliquity." *Gordon,* 862 N.E.2d at 1251. Literal adherence by a
> university to its internal rules will not be required when the dismissal of a
> student "rests upon expert judgments as to academic or professional standards
> and such judgments are fairly and nonarbitrarily arrived at." *Neel,* 435 N.E.2d
> at 612 (citation omitted). In other words, the sole function of courts is to
> determine whether the educational institution acted illegally, arbitrarily,
> capriciously, or in bad faith. *Neel,* 435 N.E.2d at 613; *Gordon,* 862 N.E.2d at
> 1252; *Gagne v. Trs. of Ind. Univ.,* 692 N.E.2d 489, 496 (Ind. Ct. App. 1998),
> *trans. denied.*

*Amaya*, 981 N.E.2d at 1240;[29] *see also Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828,

831 (7th Cir. 2012) ("[H]ornbook rules cannot be applied mechanically where the principal is an

educational institution and the result would be to override [an academic] determination. Thus,

Indiana courts have quite properly exercised the utmost restraint in applying traditional legal

rules to disputes within the academic community, noting that literal adherence to internal rules

will not be required where the dismissal rests upon expert judgments as to academic or

professional standards.") (citations omitted).   In other words, "[i]t is well settled that before a

court will intervene into the implied contractual relationship between student and university,

there must be some evidence that the university acted arbitrarily or in bad faith."  *Id.* at 1241; *see*

---

[29]The Plaintiff in *Amaya*, like Castelino, was dismissed from school after being found
guilty of academic misconduct.

*also Sung Park v. Indiana Univ. Sch. of Dentistry*, 692 F.3d 828, 830-31 (7th Cir. 2012)

("Absent some indication that this decision was arbitrary or made in bad faith . . . we decline to

second-guess the judgment of the faculty.") (citing *Neel*, 435 N.E.2d at 613).

That means that it is not sufficient for Castelino to simply identify specific rules in Rose-

Hulman's various policy handbooks with which he believes Rose-Hulman failed to comply.

Rather, in order to survive summary judgment on his breach of contract claim, Castelino must

point to evidence from which a reasonable jury could conclude that Rose-Hulman's employees

"engaged in the conscious doing of a wrong because of dishonest purpose or moral obliquity or

had a state of mind affirmatively operating with furtive design or ill will." *Id.* at 1242 (citations

omitted). Castelino fails to do so.

Castelino asserts that Rose-Hulman breached its contract with him in the following ways:

- Rose-Hulman failed to follow its Procedural Rule 6 by bringing more than one
  charge of misconduct before the Rules & Discipline Committee at one hearing.[30]

---

[30]The provision of the Student Handbook that Castelino refers to as "Rule 6" applies to appeals of disciplinary actions considered by the Rules and Disciplinary Committee and provides that "Guilt or innocence in a case shall be determined solely on the merits of that case. The Committee shall not review the previous disciplinary record of the accused before the hearing, or permit such information to be introduced in the hearing, or allow such knowledge as they may have to bias their judgment." *See* Dkt. No. 56-10 at 54. However, the Student Handbook also specifically provides that "If the Dean of Students finds a student involved in more than one instance of Academic Misconduct, the Dean may bring the case to the Institute Rules and Discipline Committee." *Id.* That procedure was followed. Dkt. No. 246-30 (letter dated April 20, 2016, from Dean of Students Gustafson to the Rules and Discipline Committee that states "Justin Castelino has accumulated 3 documented cases of academic misconduct. I am forwarding this information to the Committee for its review to determine if additional sanctions or penalties should be leveled against Mr. Castelino."). Clearly the Committee must consider all of the acts of academic misconduct in order to determine what the consequences of those multiple acts should be.

- Rose-Hulman failed to provide a full recording of the April 2013 hearing on Dr. Hanson's charge against Castelino; the recording provided is incomplete. *See* Dkt. No. 237 at 24 ("Whether the Defendant did not properly record the hearing or chose to exclude evidence that Dr. Hanson discriminated against Justin, no one could rely on that recording for all the facts so [Castelino] could not appeal the adverse decision, a right to be safeguarded.").

- Dr. Sutterer failed to follow proper procedure in handling Dr. Chapman's charge of submitting duplicate work.[31]

- Rose-Hulman treated Dr. Chapman's accusation that Castelino lied about whether the note sheet contained cut and pasted material as an act of academic misconduct, rather than an ethical violation. Dkt. No. 237 at 29 ("Dr. Chapman's admission, DD #26, Dckt. #56-29, that lying was not academic misconduct called for a completely different disciplinary process. DD # 10, p 51-57. Denying that breached the contract with Justin.").[32]

---

[31]This is a reiteration of Castelino's arguments that Dr. Sutterer changed the charge against him from plagiarizing to submitting duplicate work and that submitting duplicate work is not academic misconduct as defined by Rose-Hulman. As discussed above in the Court's discussion of Castelino's ADA claims, those arguments are without merit. The Court also notes that Castelino's citation to the 1 hour, 8 minute, and 15 second mark of the recording of the disciplinary hearing as containing a discussion between Drs. Sutterer and Ditteon of "the fact that prohibiting duplicate work was not a published policy" is an inaccurate characterization of the content of the recording.

[32]Castelino mentions several times throughout his briefs that Dr. Chapman, who is an attorney in addition to being an engineering professor, included language in his syllabus regarding copyrighted material. Specifically, the syllabus stated:

All materials used in this class are protected by copyright. While academic fair use doctrine permits their use for this course, no materials may be used beyond the date of this course without express permission of the rights holders.

Even assuming that Castelino is correct that some or all of these things fell short of following the procedures established by Rose-Hulman, Castelino points to no evidence that any of these procedural failures were the result of bad faith; nor has he articulated how the various procedural violations harmed him, as he does not explain why he believes the outcome would have been different if the "correct" procedure had been followed.[33]  He also argues that it was improper for Rose-Hulman to permit the Admissions and Standing Committee to consider Castelino's behavioral issues in deciding whether he would be readmitted, but, as noted above, he

---

Dkt. No. 56-22 at 5.  The Court notes that while Castelino asserts in his brief that the website he cites to as evidence that Dr. Chapman was an attorney "encouraged [Castelino] to believe that he practiced [law], and as a lawyer, Dr. Chapman had credibility" when he included the information about the Fair Use Doctrine in his syllabus, Dkt. No. 291 at 18, Castelino cites to no evidence that he saw the website in question or otherwise knew that Dr. Chapman was an attorney prior to the note sheet incident.  In any event, Castelino argues that this language "implied that [Castelino] could use the materials on a crib sheet permitted for an exam."  Dkt. No. 291 at 18-19.  It did not; it simply stated that students would not run afoul of copyright law if they used the materials for the course.  Of course, Castelino was not accused of violating copyright law with his note sheet, so any statements made by Dr. Chapman regarding the Fair Use Doctrine are wholly irrelevant to the issues in this case.

[33]To the extent that Castelino argues that Rose-Hulman violated his due process rights under the Fourteenth Amendment, *see, e.g.,* Dkt. No. 237 at 24 ("Private colleges are not generally subject to 14th Amendment protections or constitutional due process scrutiny, The New Star Chamber, 35 Suffolk U. L. Rev. 169 (2001), but 'generally not' is not 'never.'"); Dkt. No. 264 at 8 ("Ignoring the behavior then and using them against him now violates his right to due process of law under the 14th Amendment."), that argument is without merit.  *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) ("Embedded in our Fourteenth Amendment jurisprudence is a dichotomy between state action, which is subject to scrutiny under the Amendment's Due Process Clause, and private conduct, against which the Amendment affords no shield, no matter how unfair that conduct may be.").  To the extent that there are exceptions to this rule, Castelino has failed to articulate how such an exception applies to his claims in this case.  The closest he comes is noting that Rose-Hulman "receives Federal money," Dkt. No. 264 at 20 n.6 (citing Dkt. No. 56-10 at 70-71, which notes that Rose-Hulman's students receive federally backed student loans).  Assuming that is a correction factual assertion, "[t]he fact that the school receives federal funds did not transform either the school or its employees into state actors." *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 694 (7th Cir. 2017) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 840-42 (1982)).

affirmatively states that he is not suing for the failure to readmit him, and in any event he points to no evidence that this was done in bad faith.

Finally, Castelino argues that Rose-Hulman breached its contract with him by failing to follow its own non-discrimination policy when it violated the ADA by denying him various accommodations and discriminating against him on the basis of his disability. Even assuming that a violation of the ADA could form the basis of a breach of contract action because of Rose-Hulman's non-discrimination policy, Castelino has failed to point to evidence that would support a finding that the various actions in question violated the ADA. As discussed above, it is not sufficient to simply say an accommodation was not provided; there must be evidence that the accommodation in question was a reasonable accommodation of his disability and that an alternative reasonable accommodation was not provided. Further, he points to no evidence from which a reasonable jury could conclude that any of the actions he points to were taken because of his disability or that they disproportionately impacted him because of his disability.

As set forth above, the Court finds that Castelino has not, either in conjunction with his own motion for summary judgment or in his response to Rose-Hulman's motion for summary judgment, pointed to evidence of record from which a reasonable factfinder could find in his favor on his breach of contract claim. Accordingly, Castelino's motion for summary judgment is denied and Rose-Hulman's motion for summary judgment is granted with regard to that claim.

## C.  Defamation

In his own motion for summary judgment, Castelino asserts a defamation claim based on Dr. Chapman's April 7, 2015, letter charging him with academic misconduct with regard to the note sheet incident.

> To establish a claim of defamation, a "plaintiff must prove the existence of 'a communication with defamatory imputation, malice, publication, and damages.'" *Trail v. Boys & Girls Clubs of N.W. Ind.,* 845 N.E.2d 130, 136 (Ind. 2006) (quoting *Davidson v. Perron,* 716 N.E.2d 29, 37 (Ind. Ct. App. 1999), *trans. denied* ). A statement is defamatory if it tends "to harm a person's reputation by lowering the person in the community's estimation or deterring third persons from dealing or associating with the person." *Kelley v. Tanoos,* 865 N.E.2d 593, 596 (Ind. 2007) (internal citation omitted). One type of defamation action, alleging defamation *per se,* arises when the language of a statement, without reference to extrinsic evidence, constitutes an imputation of (1) criminal conduct, (2) a loathsome disease, (3) misconduct in a person's trade, profession, office, or occupation, or (4) sexual misconduct

*Dugan v. Mittal Steel USA Inc.*, 929 N.E.2d 184, 186 (Ind. 2010). Castelino alleges, and the Court agrees, that an accusation of academic misconduct would constitute defamation *per se* if it otherwise satisfied the definition of defamation.

Rose-Hulman argues that it cannot be held liable for defamation for Dr. Chapman's letter because it is privileged. Indiana law recognizes a "qualified privilege that applies to communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992) (citation omitted). "Absent a factual dispute, whether a statement is protected by a qualified privilege is a question of law." *Id.*

> A statement otherwise protected by the doctrine of qualified privilege may lose its privileged character upon a showing of abuse wherein: (1) the communicator was primarily motivated by ill will in making the statement; (2) there was excessive publication of the defamatory statements; or (3) the statement was made without belief or grounds for belief in its truth. Once the communication is established as qualifiedly privileged, the plaintiff then has the burden of overcoming that privilege by showing that it has been abused.

*Id.* (citations omitted).

Castelino properly concedes that Dr. Chapman's misconduct charge is the type of communication that falls under the qualified privilege; as a professor, Dr. Chapman had a duty to hold a student accountable for acts of academic misconduct, and he used the appropriate means to report his belief that Castelino had committed misconduct by "publishing" the letter to the proper individuals at Rose-Hulman. Dkt. No. 291 at 46 ("Rose-Hulman policy properly required Dr. Chapman to provide a copy of the letter to certain Rose-Hulman employees, and this would give him a qualified privilege."). Castelino argues, however, that Dr. Chapman "was on notice that [Castelino] did not lie about his notecard" and that "knowledge of the falsity of the charges exceeds the privilege." *Id.*

The operative question is whether Castelino has pointed to evidence from which a reasonable factfinder could conclude that Dr. Chapman's letter was written and published without belief or grounds for belief in its truth. He has not. The only evidence that Castelino points to regarding this issue is the testimony of his witness, Jessica Pinto, at the May 2015 disciplinary hearing that Castelino told Dr. Chapman that he "did not just copy and paste" his note sheet.[34] This testimony does not demonstrate that Dr. Chapman lacked grounds for believing the accusations in his letter were true. At most, Pinto's testimony demonstrates that

---

[34]Castelino also states that Dr. Chapman "knew that [Castelino] was not guilty of theft of intellectual property," Dkt. No. 237 at 31, an assertion for which he cites to Dr. Chapman's syllabus and the website that indicates that Dr. Chapman is an attorney. *See also* Dkt. No. 291 at 46 ("When he filed his charges, Dr. Chapman knew that Justin was not guilty of theft of intellectual property. He was an attorney; his syllabus advised his students of a legal doctrine that protected their use of copyrighted material for their course work.") (citation omitted). Castelino is referring to his argument, discussed above, regarding Dr. Chapman's statement in his syllabus regarding the fair use doctrine. However, Dr. Chapman's letter does not accuse Castelino of a violation of the fair use doctrine or any violation of intellectual property rights. Rather, the letter states that "[p]resenting someone else's work as your own is intellectual theft," and warned Castelino that such behavior can end an engineer's career. Dkt. No. 56-29.

Dr. Chapman may have misunderstood what Castelino meant when he said he "didn't just cut and paste." Indeed, Castelino acknowledged that possibility in his deposition testimony: "I told everybody it wasn't just copied-and-pasted slides. And whether they misunderstood me, uh,--." Dkt. No. 246-9 at 251. Given the context of the conversation, such a misunderstanding would not be unreasonable. Accordingly, there is no evidence that Dr. Chapman lacked grounds for believing in the truth of the statements in his letter and, as a matter of law, the qualified privilege applies to the letter. Rose-Hulman therefore is entitled to summary judgment on Castelino's defamation claim based on Dr. Chapman's letter.

Rose-Hulman's motion for summary judgment also addresses the allegation in Castelino's Amended Complaint that Dr. Sutterer "withdrew his signature under false pretense and with full knowledge that the falsehood defamed Mr. Castelino," Dkt. No. 72 ¶ 94, and "By lying about his signature on Mr. Castelino's drop sheet to members of the faculty, especially the members of Mr. Castelino's Rules and Discipline Committee, Dr. Sutterer defamed Mr. Castelino in excess of any qualified privilege." *Id.* ¶ 185. This allegation refers to the fact that Dr. Sutterer had signed a form granting Castelino permission to drop Dr. Chapman's CE 380 course, even though the deadline for dropping courses had passed, based on Castelino's representation that Dean of Students Peter Gustafson had granted Castelino an extension of the deadline to drop the course pending the outcome of the Rules and Disciplinary Hearing. On May 12, 2015, Dr. Sutterer sent an email to Castelino and several others in which he informed Castelino that he was withdrawing his consent to drop Dr. Chapman's course because he had learned that Gustafson had not granted such an extension. In his response brief, it appears that Castelino is not alleging that Dr. Sutterer's email was defamatory, but rather that Gustafson defamed him by telling Dr. Sutterer that he had not granted the extension. Dkt. No. 264 at 5

38

("But the day before, on May 11, Mr. Gustafson informed Justin that 'Sometimes the Registrar grants a short extension on the final drop date if you are not able to find the instructor . . .' See Plaintiff's Exhibit 9, attached. This letter certainly implies that Mr. Gustafson supported Justin in seeking an extension. Anything to the contrary that Mr. Gustafson later told Dr. Sutterer was a defamation which Dr. Sutterer believed."). This is a gross mischaracterization of the exhibit cited by Castelino, which simply cannot be read as Gustafson extending the deadline. *See* Dkt. No. 264-10 (email from Gustafson to Castelino reading "I'm not sure what you decided to do about the course that you were considering dropping, but if you haven't turned it in and plan to you should do so immediately. Sometimes the Registrar grants a short extension on the final drop date if you are not able to find the instructor, but you should have seen her last Friday to get that extension. It is now past the drop date and I don't believe you've spoken to her about this."). Thus, Castelino points to no evidence that Gustafson made any false statement regarding him. Rose-Hulman therefore is also entitled to summary judgment on Castelino's defamation claim based on this incident.

### D. Harassment

Castelino points to the definition of "harassment" as that term is used in the Indiana statutes relating to the crime of stalking and argues, without elaboration, that Rose-Hulman's faculty and staff harassed him. Castelino fails to cite any authority for the proposition that Indiana recognizes a tort of "harassment" and fails to articulate what actions he believes constituted harassment, asserting only that "[t]he documents supporting Dckt ##236 and 237 prove the Defendant's faculty and staff harassed and continue to harass Justin by statutory definition. See I.C. Sec. 35-45-10-2. They further prove that suspension and consequent damages

resulted." Dkt. No. 264 at 6.  This falls far short of a cogent, properly supported argument.

Accordingly, Rose-Hulman is entitled to summary judgment on Castelino's harassment claim.

### E.  False Advertising

Castelino asserts a claim for false advertising in his amended complaint, and Rose-

Hulman moves for summary judgment on that claim.[35]  The only argument Castelino makes

regarding that claim is found in his reply in support of his motion for summary judgment, which

reads as follows:

> The unavailability of a tutor at the Learning Center for one of Castelino's courses
> constitutes proof of the Defendant's false advertising. Compare Dckt #56-24,
> Defendant's online ad offering tutors at the Learning Center, with Dckt. #56-25,
> Dr. Sutterer's retraction of the ad offer. Justin's Department Head announced that
> there are no tutors for upperclassmen; this turns the ad into fraudulent
> inducement.

Dkt. No. 291 at 45.  This, too, falls far short of a cogent, properly supported argument.   In any

event, the Court notes that the advertisement pointed to by Castelino states that Rose-Hulman

"offers individual and small group tutoring."  Dkt. No. 237 at 20 (citing Dkt. No. 56-24).  It

does.  The advertisement does not promise a tutor for every class and at any time a student

wishes to consult with one.  Accordingly, Rose-Hulman is entitled to summary judgment on

Castelino's false advertising claim.

### F.  Invasion of Privacy

Castelino does not respond to Rose-Hulman's motion for summary judgment on his

invasion of privacy claim. Accordingly, Castelino has pointed to no evidence to support such a

claim, and Rose-Hulman is entitled to summary judgment on this claim.

---

[35]While Castelino mentions false advertising in his brief in support of his own summary
judgment motion, he does not make any argument regarding the claim.

### G. Malice

Finally, Castelino argues that Rose-Hulman is liable to him for punitive damages because it maliciously failed to comply with its own student handbook, which provides that

> A suspension ruling will be recorded on the student's academic record, unless the case is successfully appealed. In the case of a temporary suspension, this record will be removed at the end of the suspension period. In the case of permanent suspension it will remain permanently.

Dkt. No. 56-10 at 53. Castelino's transcript still contains the following note: "Suspended effective end of Spring Qtr 2014-2015 through end of Fall Qtr 2015-2016." This, Castelino argues, constitutes a breach of Rose-Hulman's contract with him. Further, he argues:

> On July 27, 2017 Justin amended his complaint to seek punitive damages for deliberate sabotaging his mitigation efforts. At the settlement conference on September 25, 2017 the Defendant's only offer of settlement was a promise to delete the suspension if Justin dropped this suit. Demanding anything of value in exchange for a promise to refrain from an act one has no right to commit is extortion. This has proved Rose-Hulman's affirmative malice.

Dkt. No. 237 at 34. This argument is without merit for many reasons, the most obvious of which is that Castelino's suspension has become permanent and therefore it appropriately remains noted on his transcript pursuant to the provision to which he cites. Accordingly, Rose-Hulman is entitled to summary judgment on this claim as well.

## IV. CONCLUSION

For the reasons set forth above, Castelino's motion for summary judgment (Dkt. No. 236) is **DENIED** and Rose-Hulman's motion for summary judgment (Dkt. No. 254) is **GRANTED** as to all of Castelino's claims. Only Rose-Hulman's counterclaims remain pending. **Counsel shall confer and file a notice within 21 days of the date of this Entry informing the Court of their positions regarding when the trial of the counterclaims should be held and how long it will take.**

Also pending is Rose-Hulman's Motion for Sanctions and Dismissal (Dkt. No. 196). That motion is **DENIED AS MOOT**, insofar as it requests dismissal of Castelino's claims as a sanction, as is Castelino's motion for leave to file a surreply opposing that motion (Dkt. No. 232). If Rose-Hulman wishes to file a motion seeking an award of attorney fees or other expenses pursuant to Federal Rule of Civil Procedure 37 or 28 U.S.C. § 1927, it may do so **within 45 days of the date of this Entry**. Any such motion must specify the fees and/or expenses that Rose-Hulman asserts it incurred as a result of each alleged improper action by Castelino or his counsel and be accompanied by appropriate evidence regarding those fees and expenses.

SO ORDERED: 1/30/2019

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification