# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

June 25, 2021

To:  Roger A. G. Sharpe
     UNITED STATES DISTRICT COURT
     Southern District of Indiana
     104 U.S. Courthouse
     Terre Haute, IN 47807

| | |
|---|---|
| | JUSTIN CASTELINO,<br>Plaintiff - Appellant |
| No. 19-1905 | v. |
| | ROSE-HULMAN INSTITUTE OF TECHNOLOGY,<br>Defendant - Appellee |
| **Originating Case Information:** | |
| District Court No: 2:17-cv-00139-WTL-MJD<br>Southern District of Indiana, Terre Haute Division<br>District Judge William T. Lawrence | |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                    No record to be returned

form name: **c7_Mandate**    (form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

June 3, 2021

Before

ILANA DIAMOND ROVNER, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

| | |
|---|---|
| No. 19-1905 | JUSTIN CASTELINO,<br>    Plaintiff - Appellant<br><br>v.<br><br>ROSE-HULMAN INSTITUTE OF TECHNOLOGY,<br>    Defendant - Appellee |
| **Originating Case Information:** | |
| District Court No: 2:17-cv-00139-WTL-MJD<br>Southern District of Indiana, Terre Haute Division<br>District Judge William T. Lawrence | |

The judgment of the District Court is AFFIRMED, with costs, in accordance with the decision of this court entered on this date.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 19-1905

JUSTIN CASTELINO,

*Plaintiff-Appellant,*

*v.*

ROSE-HULMAN INSTITUTE OF
TECHNOLOGY,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 17 CV 139 — **William T. Lawrence**, *Judge.*

---

SUBMITTED[*] SEPTEMBER 29, 2020 — DECIDED JUNE 3, 2021

---

Before ROVNER, BRENNAN, and SCUDDER, *Circuit Judges*.

---

[*]   The court ordered that oral argument in this case be vacated after appellant's counsel was granted leave to withdraw. The case is therefore submitted on the briefs and record.

ROVNER, *Circuit Judge*. Justin Castelino was suspended from Rose-Hulman Institute of Technology for a semester for academic misconduct. When he applied to return the following spring, Rose-Hulman denied his requests for readmission and also informed him that he would not be permitted to reapply in the future. Castelino then sued Rose-Hulman, alleging that his suspension violated the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and also asserting claims against Rose-Hulman for breach of contract, defamation, false advertising, invasion of privacy, and malice. The district court entered summary judgment for Rose-Hulman on all counts and also granted Rose-Hulman's motion for sanctions based on Castelino's failure to comply with a scheduling order. Castelino appeals, but we affirm.

## I.

We note at the outset that Castelino's brief falls short of compliance with Federal Rule of Appellate Procedure 28 in many respects.[1] Thus, although we construe the facts in the light most favorable to Castelino, we rely for the details on Rose-Hulman's brief and the record, which more clearly, objectively, and accurately set forth the factual background. In the fall of 2012, Castelino enrolled as a transfer student at Rose-Hulman Institute of Technology, a private engineering, mathematics, and science college in Terre Haute, Indiana. As a student at Rose-Hulman, Castelino received certain accom-

---

[1] In addition to the more substantive deficiencies, which we will describe where relevant, Castelino's brief contains numerous hallmarks of carelessness, such as improper case citations and the misspelling of his name both in the caption ("Castelion") and elsewhere in the brief ("Castleino").

modations based on what he identifies in his brief on appeal as a "documented auditory processing disorder." Specifically, Castelino provided Rose-Hulman with a neuropsychological report diagnosing him with attention-deficit/hyperactivity disorder ("ADHD") and a learning disorder. Rose-Hulman granted Castelino an accommodation that allowed him to receive 100% extended time on tests and quizzes, which he was allowed to take in a distraction-free environment.

While at Rose-Hulman, Castelino was reprimanded several times for academic misconduct. In 2013, one of Castelino's professors, Dr. James Hanson, saw him copying from another student's homework. Dr. Hanson issued a letter of academic misconduct following the incident. Castelino appealed the letter to the college's Rules and Discipline Committee, but the Committee allowed the letter to remain in Castelino's file. The following year Castelino received another letter of academic misconduct. This time he and another student submitted duplicate work in a course taught by Dr. Jeremy Chapman. The head of the Civil Engineering Department, Dr. Kevin Sutterer, met with Castelino about the incident. After hearing his explanation, Dr. Sutterer decided it was possible that Castelino had submitted the duplicate work as the result of a misunderstanding. Thus, although the Civil Engineering Department ordinarily requests a student's suspension after a second incident of academic misconduct, Dr. Sutterer did not refer Castelino for suspension. Instead, Dr. Sutterer warned Castelino that he risked dismissal from Rose-Hulman if any further incidents of academic misconduct occurred.

The third and final incident of alleged academic misconduct occurred in April 2015. At that time, Castelino was taking

Dr. Chapman's course again after having dropped it the previous year. In the interim, Dr. Chapman had changed his policy regarding the use of notes on exams. Although he had previously allowed students to use typed notes when taking exams, he began requiring hand-written notes after discovering students were often simply using course slides that they had cut and pasted. Dr. Chapman announced this policy at the beginning of the quarter, and then reminded students of the policy on Thursday, April 2 in anticipation of an exam the next day.

After class, Castelino asked if he could use his typed notes from the previous semester and assured Dr. Chapman that they were not cut and pasted course slides. After Dr. Chapman rejected that proposal, Castelino met with the Director of Disability Services, Karen DeGrange, and Dr. Sutterer about the situation. He explained that his poor handwriting would make the hand-written note requirement too difficult for him. DeGrange then contacted the campus Learning Center to ask if a tutor could transcribe Castelino's notes for him.

Although there was a tutor in the Learning Center available to transcribe Castelino's notes then, by the time Castelino arrived there close to 5 p.m., there was no one there to transcribe for him. After Castelino advised DeGrange that he could not get a tutor to transcribe his notes, she and Dr. Sutterer met and concluded that Castelino would be allowed to use his typed notes for this one exam.

Castelino took his exam in the Learning Center, and when he turned in his notes afterward (as all students are required to do), it came to light that they contained twenty-six cut and

pasted course slides. This prompted Dr. Chapman to write a letter of academic misconduct explaining that by using the course slides with his notes, Castelino had both violated Dr. Chapman's explicit instructions as well as lied to Dr. Chapman, DeGrange, and Sutterer by claiming that his typed notes did not contain cut and pasted slides. Dr. Chapman also noted that the letter was the second of its kind in his course based on Castelino's unethical conduct.

Because this was Castelino's third documented case of academic misconduct, the Dean of Students, Pete Gustafson, forwarded it to the Rules and Discipline Committee for review. The Rules and Discipline Committee met on May 13, 2015 to consider the allegations of academic misconduct against Castelino. He claimed at the hearing that he had never told Dr. Chapman that his notes did not contain *any* cut and pasted course slides, only that his notes were not "just" cut and pasted slides. Castelino's fiancée, who had been waiting for him outside the classroom when he spoke to Dr. Chapman, also testified. When Dr. Chapman asked her whether she had overheard Castelino tell him that "nothing was copy-and-pasted," she said "yeah" and explained that she had heard him ask to use his notecard from the previous year because it "wasn't just copy and paste."

Ultimately the Rules and Discipline Committee concluded that Castelino was guilty of repeated acts of academic misconduct. He was suspended for one quarter, after which he could apply for readmission. The committee's suspension decision was upheld on Castelino's appeal to the full faculty. As part of that process, Castelino met with the President of Rose-Hulman, James Conwell, to discuss the appeal procedures. Dr. Conwell

reported that during that meeting Castelino yelled and accused him of unfairly configuring the disciplinary hearing. After asking Castelino to calm down, Dr. Conwell had to ask him to leave and not return in-person to his office.

Castelino applied for readmission multiple times. The readmission process starts with a written petition to the Dean of Students, Erik Hayes, who submits a recommendation to the Admissions and Standing Committee. That Committee meets with the student to consider his readmission request and determine whether he can be a successful member of the Rose-Hulman community. Castelino did not apply for readmission when he first became eligible in the winter quarter 2015–2016, but he did apply in January 2016. In his letter to the Admissions and Standing Committee, Dean Hayes did not recommend readmission. He based his recommendation on Castelino's failure to accept responsibility for his actions as well as his long history of behavioral issues while at Rose-Hulman. These incidents ranged from altercations and rude conduct on campus to complaints by female students that he was taking their photographs without permission.

At the hearing itself, Castelino was unable to say what courses he would be taking if readmitted, despite the fact that classes began the following day. The Committee denied Castelino's readmission request (along with three other students requesting readmission that quarter), both because of his failure to accept responsibility for his actions and because there was no academic benefit for him to start that semester instead of the next.

Castelino then applied for readmission and was rejected again in June 2016. While Castelino was suspended, the Committee had become aware that he had been arrested the previous year in Connecticut for breach of peace, cultivation, possession, and sale of marijuana, as well as operation of a drug factory and possession of a hallucinogen. At his hearing, Castelino provided a number of conflicting explanations for the news article describing his arrest, ranging from the claim that his fiancée had "stuff" on her to assertions that the article was part of a cover-up for the fact that he was a confidential informant. The Committee again rejected Castelino's request for readmission.

In March 2017, Castelino sued Rose-Hulman in federal court, alleging disability discrimination in violation of Title III of the ADA as well as state-law claims for breach of contract, defamation, false advertising, invasion of privacy, and harassment. He later amended his complaint, alleging malice and requesting punitive damages.

In August, the case was referred to a magistrate judge for a settlement conference. The settlement conference order required Castelino to serve an updated settlement demand fourteen days prior to the conference, and for the parties to email the court a confidential settlement statement three days before the conference. Despite a reminder e-mail from Rose-Hulman, Castelino failed to do either until the day before the settlement conference. After the conference, both parties moved for sanctions. The magistrate judge recommended granting Rose-Hulman's motion for sanctions and denying Castelino's. The district court adopted the magistrate judge's recommendation. Thereafter, both parties moved for summary

judgment. In considering the parties' motions, the district court observed that it had "been hindered by the manner in which Castelino briefed his own motion and his opposition to Rose-Hulman's motion." Notwithstanding this, the district court thoroughly and carefully considered the parties' arguments and granted summary judgment to Rose-Hulman.

## II.

On appeal, Castelino asks us to reverse the district court's grant of summary judgment to Rose-Hulman and grant judgment in his favor. He also requests that we impose sanctions against Rose-Hulman. We review the district court's ruling on the parties' cross motions for summary judgment de novo, viewing the facts and drawing reasonable inferences in favor of "the party against whom the motion at issue was made." *Woodring v. Jackson Cty. Ind.*, 986 F.3d 979, 984 (7th Cir. 2021) (quotations and internal citation omitted). At the outset, it is worth noting that, like the district court, our ability to analyze Castelino's claims is severely limited by his presentation of them. The district court noted that although Castelino "points to a large number of exhibits throughout his briefs, he often fails to articulate in any coherent manner how he believes those exhibits, coupled with the applicable law, demonstrate that he is entitled to (or Rose-Hulman is not entitled to) summary judgment on an issue." The district court's observations apply with equal force to Castelino's briefs on appeal. Thus, we consider Castelino's claims to the extent possible, while echoing the district court's reminder that, "'It is not the obligation of th[e] court to research and construct the legal arguments open to parties, especially when they are repre-

sented by counsel.'"[2] *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) (quoting *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988)).

**ADA Claim**

Castelino claimed Rose-Hulman violated Title III of the ADA, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation[.]" 42 U.S.C. § 12182(a). As relevant here, discrimination under Title III of the ADA includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities[.]" 42 U.S.C. § 12182(2)(A)(ii).

The district court first concluded that some of Castelino's claims under the ADA were barred by the statute of limitations. Because the ADA does not contain its own limitation period, "'the most appropriate state limitations period ap-

---

[2] Castelino takes issue with the district court's comment, claiming that it "rejected the responsibility to construct Castelino's arguments, but it had the authority. FRCP Rule 56(e)(3) obligates it to examine Castelino's Motion and *all* his supporting materials, regardless whether they support or address an assertion of fact properly. That authorized the District Court to construct arguments for a party, but not to decide, arbitrarily, what evidence to consider and what to ignore." First, Rule 56(e)(3) imposes no such duty on the district court . Moreover, Castelino's suggestion that the district court somehow failed to properly consider his claims underscores his fundamental misunderstanding of his obligation to construct coherent arguments for consideration.

10                                    No. 19-1905

plies.'" *Scherr v. Marriott Int'l, Inc. et al.*, 703 F.3d 1069, 1075 (7th
Cir. 2013) (quoting *Soignier v. Am. Bd. of Plastic Surgery*, 92 F.3d
547, 550 (7th Cir. 1996)). Thus, we apply Indiana's two-year
statute of limitations for personal injury claims. Ind. Code
§ 34-11-2-4(a) (West 2013); *Soignier*, 92 F.3d at 551 n.3. As the
district court recognized, this means that Castelino's ADA
claims based on events occurring prior to March 28, 2015
would be time-barred based on his complaint filed on March
28, 2017.

Although Castelino's brief mixes and matches his various
claims indiscriminately throughout, it is clear that his ADA
claim is premised on what he characterizes as a failure to
accommodate his disability by both Dr. Hanson and
Dr. Chapman. As described above, Dr. Hanson issued a letter
of academic misconduct in 2013, well outside the applicable
statute of limitations. Likewise, the May, 2014 report of
academic misconduct by Dr. Chapman falls outside the statute
of limitations.

Castelino attempts to salvage his time-barred claims with
two unpersuasive arguments. He first suggests that his claims
are governed not by Indiana's two-year personal injury statute
of limitations, but by the four-year catch-all statute of limita-
tions for federal claims found in 28 U.S.C. § 1658. In 2004, the
Supreme Court held that § 1658 applies to claims "made
possible by a post-1990 enactment" as well as claims made
possible by a post-1990 amendment to an existing statute. *See
Jones v. R.R. Donnelley & Sons, Co.*, 541 U.S. 369, 382 (2004)
(noting that "[a]ltering statutory definitions, or adding new
definitions of terms previously undefined, is a common way of
amending statutes") (citation and internal quotations omitted).

No. 19-1905                                                            11

Although the ADA was amended effective January 1, 2009 to "carry out the ADA's objectives" by "reinstating a broad scope of protection," *see* ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), Castelino fails to explain how those amendments made his claim possible. He states without elaboration that the ADAAA overturned *Sutton v. United Air Lines Inc.*, 527 U.S. 471 (1999), and redefined "disability" and "major life activity" and that because of this his perceptual disorder falls into the new categories. True as it may be that the ADAAA rejected *Sutton's* narrow definitions of "disability" (rejecting disabilities that could be ameliorated by medication, assistive technology, or adaptation) and "major life activity" (requiring substantial limitations in multiple life activities), Castelino fails in any way to connect those changes to his claim.

Castelino also summarily contends that Indiana's "continuing wrong" doctrine would apply to toll the statute of limitations because Rose-Hulman engaged in a "course of conduct" that began while he was a student and continued to injure him after his suspension. This claim, too, goes nowhere because it is well-established that the statute of limitations starts to run upon the "discovery of the original act of discrimination, *not* future confirmation of the injury or determination that the injury is unlawful." *See Soignier*, 92 F.3d at 551 (emphasis in original) (collecting cases); *cf. Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1988) ("[T]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful.") (citations omitted) (emphasis in original).

That leaves Castelino's ADA claims premised on conduct occurring after March 28, 2015. To avoid summary judgment on his claim based on what he refers to as "the notecard incident," Castelino would need to demonstrate that Rose-Hulman discriminated against him by failing to make a reasonable accommodation for his disability. Instead of making any attempt to explain why the exception allowing him to use his typed notes failed to accommodate his disability, Castelino makes a series of largely irrelevant attacks on the district court's opinion.

For instance, in response to the district court's observation that nothing suggested that Dr. Chapman intentionally omitted the new policy about notes from the syllabus, Castelino points to testimony from his disciplinary hearing that he claims establishes that Dr. Chapman intentionally omitted the policy from his syllabus. Castelino then asserts that Chapman had "no authority to enforce the new policy on one day's notice." Without explanation, Castelino points to 42 U.S.C. § 12182(b)(1)(A)(iii) and *Guckenberger v. Boston University*, 947 F. Supp. 106 (D. Mass. 1997), as supposed support for his assertion. The portion of the ADA he refers to simply prohibits the provision of separate benefits to disabled individuals. And *Guckenberger* is a class-action suit by university students with ADHD. The page Castelino cites concludes that the university's strict eligibility criteria for professionals evaluating whether students had a learning disability could screen out some individuals with a learning disability. Neither of these citations tends to show that Rose-Hulman or Dr. Chapman discriminated against Castelino on the basis of his ADHD (and other diagnosed learning disabilities) by changing his testing policy

No. 19-1905                                                    13

to require hand-written notes, and then allowing Castelino to
use his typed notecards when he could not find anyone to
transcribe them before the exam.

The rest of Castelino's arguments as to how he has shown
discrimination under the ADA are similarly inscrutable. He
points to the district court's citation of *Amaya v. Brater*, 981
N.E.2d 1235 (Ind. App. 2013), for the proposition that the sole
function of the courts is to determine whether an educational
institution acted illegally, arbitrarily, or in bad faith. The
district court cited *Amaya*, a case setting out the standard under
Indiana law for a breach of contract claim against a university,
in analyzing Castelino's breach of contract claim. Castelino,
however, inexplicably cites *Amaya* as support for his claim that
Dr. Chapman acted "arbitrarily and capriciously" (Appellant's
Br. 21), by attempting to enforce his notecard policy, as did
Rose-Hulman and Dr. DeGrange by permitting him to use his
old typed notes. He reasons that the typed notecards "earned
him a -0- on the exam" and that Rose-Hulman's "ratification of
those charges by its guilty finding in spite of Dr. DeGrange's
guarantee … perpetuated Dr. Chapman's discrimination"
which, taken together, lead to the "only justifiable conclusion"
that "Dr. Chapman's enforcement of a new policy denied
Castelino of an accommodation which the district court found
reasonable." (Appellant Br. 22)

Castelino's argument, to the extent there is one, is rendered
nearly incomprehensible with reference to the wrong legal
standards (as recounted above) and unsupported legal
conclusions and factual claims. As described above, there is no
relationship between the "arbitrary and capricious" standard

applicable to contract claims and the question of whether an accommodation is reasonable under the ADA.

Moreover, Castelino's argument is based on a non-sequiter: that it was being allowed to use his typed notecards (the accommodation) that led to his failing exam score and subsequent discipline. Notably absent from Castelino's argument is any information calling into question the undisputed fact that he used twenty-six cut and pasted slides on his notecard in violation of what he now apparently concedes was a reasonable accommodation. It was this prohibited use of cut and pasted class slides that led to him receiving a zero on the exam, not the fact that he was allowed to use typed notes when the rest of the class had to write out their notes in longhand. In short, Castelino fails to identify any facts in the record establishing that Rose-Hulman or any of its professors failed to accommodate his learning disability. Instead, the undisputed facts establish that he was suspended and then ultimately denied readmission based on several instances of academic misconduct and other behavioral issues that have no link to his learning disabilities or need for accommodations from Rose-Hulman. Summary judgment for Rose-Hulman was thus proper on Castelino's ADA claim.

### Breach of Contract

Castelino approaches his breach of contract claim in largely the same way as his ADA claim: he quotes the district court's opinion at length and then flatly asserts that it is erroneous without any coherent explanation as to why. Castelino's claim generally is premised on his belief that Rose-Hulman failed to follow its own rules and procedures when disciplining,

No. 19-1905                                                    15

suspending, and ultimately denying him readmission. The
district court considered each of Castelino's claims in detail
and concluded that he had failed to produce any evidence of
bad faith on the part of Rose-Hulman that would sustain a
cause of action for breach of contract. We assume for purposes
of this appeal that Castelino demonstrated the existence of an
implied contract between him and Rose-Hulman based on the
Student Handbook and Faculty Handbook. *See Ross v. Creigh-
ton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992) ("It is generally held
in the United States that the basic legal relation between a
student and a private university or college is contractual in
nature.") (internal citations omitted).

Assuming the existence of such a contract, we turn to
Castelino's claim that Rose-Hulman violated its terms by
failing to comply with its own policies in his disciplinary and
readmission hearings. Castelino claims in his brief that certain
citations to unspecified portions of the Rose-Hulman Student
Handbook and the Faculty Handbook identify "five material
contract promises that Rose-Hulman wrote down, provided to
Castelino, and broke." (Appellant's Br. 28.) What these five
promises are, however, is not at all clear. In considering a
motion for summary judgment the court is not "'obligated …
to assume the truth of a nonmovant's conclusory allegations on
faith or to scour the record to unearth material factual dis-
putes.'" *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 722–23 (7th Cir.
2018) (quoting *Carter v. Am. Oil Co.*, 139 F.3d 1158, 1163 (7th
Cir. 1998)).

What is clear is that all of the alleged breaches of contract
identified by Castelino relate to what he characterizes as Rose-
Hulman's failure to precisely comply with certain disciplinary

procedures in handling his alleged misconduct, suspension, and ultimate denial of readmission. It may be that Rose-Hulman failed to comply to the letter with its own policies, but that itself does not establish a breach of contract. Indiana courts take a flexible approach to the contractual relationship between students and universities. *See Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 831 (7th Cir. 2012). In an attempt to avoid interfering with the "subjective professional judgment of trained educators, courts have quite properly exercised the utmost restraint in applying traditional legal rules to disputes within the academic community." *Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007) (citation and internal quotations omitted). Accordingly, "the sole function of courts is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith." *Amaya*, 981 N.E.2d at 1240; *see also Gordon*, 862 N.E.2d at 1251 ("[A]bsent a showing of bad faith on the part of the University or a professor, the Court will not interfere.") (quoting *Note, Contract Law & the Student-Univ. Relationship*, 48 Ind. L.J. 253, 263 (1973)).

The alleged "breaches of contract" Castelino discusses fall well within the bounds of Rose-Hulman's academic judgment.[3]

---

[3]   Castelino claims he is not challenging the professional academic judgment, but rather the "practices and procedures that preceded the decision to suspend him, because those differed from the procedures so plainly expressed in the handbooks." (Appellant's Br. 30.) Instead of explaining how the procedures used differed from the handbooks and why those deviations were arbitrary, capricious, or in bad faith, Castelino provides the following: "For example, compare Dckt. #237 at 7 to Dckt. #56-10 at 53 Art. III ¶ 4; #237 at 8 compared to Rule 6, Dckt. #56-10 pp 54–55;

(continued...)

For instance, Castelino seems to be arguing that the Student Handbook prevented the Rules and Discipline Committee from considering multiple acts of academic misconduct because the Handbook provides that, "Guilt or innocence in *a case* shall be determined solely on *the merits of that case*." (Appellant's Br. 33.). That same rule forbids the Committee from reviewing the accused's previous disciplinary record before the hearing or permitting it to be introduced in the hearing. Student Handbook at 54, IV. Hearings Before the Institute Rules and Discipline Committee, General Proc., 6. As Castelino sees it, the use of the word "case" in Rule 6 prohibits the Rules and Discipline Committee from considering multiple acts of disciplinary misconduct in a single hearing.

Rose-Hulman provided evidence establishing the history leading up to Castelino's hearing: Castelino appealed his first case of academic misconduct in 2013 to the Committee, which upheld Dr. Hanson's finding. Castelino was again accused of academic misconduct in 2014 by Dr. Chapman, who did not request a hearing. Then following the incident in Dr. Chapman's class in 2015, Dean Gustafson referred Castelino to the Rules and Disciplinary Committee under a portion of the Student Handbook providing that the Dean of Students may bring a case to the Rules and Discipline Commit-

---

[3] (...continued)

Dckt. #237 at 12, compared to Rules and Procedures Handbook, Dckt. #56-18 pp 14–23; and #237 at 29–30." This string of citations to the record, without more, is completely unhelpful in demonstrating that Rose-Hulman breached its contract with Castelino. We examined the listed citations and saw nothing tending to prove that Rose-Hulman acted arbitrarily or in bad faith in its handling of Castelino's behavior.

tee if the student is "involved in more than one instance of
Academic Misconduct." *Id.* at 53 III. Academic Misconduct,
Bringing a Case to the Rules and Discipline Committee, 3.
When Castelino discovered that he had been referred by Dean
Gustafson to the Committee for multiple acts of academic
misconduct, he asked to have both the 2014 and 2015 findings
of academic misconduct reviewed. Dr. Ditteon scheduled an
initial hearing to allow Castelino to appeal the individual acts
of misconduct and a second hearing to determine if additional
penalties were appropriate depending on the outcome of the
first hearing. Castelino himself then requested a single hearing,
which led to the May 13 Committee hearing.

At that hearing, Castelino presented witnesses and evi-
dence to support his version of events, but the Committee
voted to suspend Castelino for a quarter. Castelino cites several
cases (none in the educational context) for the unremarkable
proposition that contracts must be read in their entirety in an
attempt to harmonize differing contractual provisions. But
there is no logical reason to believe that the "General Proce-
dures" section of the Handbook describing permissible
evidence at a hearing somehow overrides the specific proce-
dures applicable when there are multiple acts of academic
misconduct as described elsewhere in the Handbook. More-
over, even assuming the Committee's decision to consider
Castelino's multiple acts of misconduct violated the Handbook
provision he identifies, he presents no evidence that the alleged
deviation was arbitrary, capricious, or undertaken in bad faith.

Castelino also characterizes it as a breach of contract for the
Committee to have considered his conduct while suspended
when he sought readmission (a second time) before the

No. 19-1905                                                    19

Admissions and Standing Committee in June 2016. Moreover, he claims that the presence of Dr. Conwell, the University President, at that same hearing amounted to a breach of contract. Tellingly, Castelino cites no specific Handbook provisions preventing Dr. Conwell from attending the read-mission hearing. He argues that Dr. Conwell "disregarded the constitutional limits" of the Standing Committee's authority by describing Castelino's arrest after his suspension. Without citing anything in the record, Castelino insists that the Standing Committee had "no authority" to consider that evidence, and suggests that the "lengths" Dr. Conwell went to in an attempt "to persuade the wrong committee to suspend Castelino permanently when it did not have the authority to do so" is "itself dishonest" and "must raise the question" whether Dr. Conwell acted in bad faith. (Appellant's Br. 44.) Not only is Castelino unable to point to any policy preventing the Standing Committee from considering his behavior while suspended, he ignores Rose-Hulman's citation to the section of the Student Handbook explaining that it "values its reputation for moral leadership" and "expects all persons associated with it to maintain this reputation." Nor can Castelino offer any explanation as to why Rose-Hulman could not reasonably apply its stated policy that it expects students "to be responsi-ble and to behave at all times with honor and integrity" when considering him for readmission.

Rose-Hulman presented evidence that Castelino consis-tently engaged in aggressive behavior while a student, and his arrest while suspended was in many respects simply a continua-tion of the sort of poor judgment he had repeatedly shown as a student. He also provides no evidence that any of his

20                                             No. 19-1905

behavior was related to his ADHD or perceptual disability. Rose-Hulman's assessment of whether Castelino should be readmitted in light of his behavior while suspended is precisely the sort of expert academic judgment to which we defer.

As noted in *Amaya*, judicial deference is warranted in light of the institution's duty to the public as well as the student. 981 N.E.2d at 1242. Given the underlying academic misconduct as well as Castelino's record of behavior both on and off campus, Rose-Hulman was entitled to exercise its professional judgment to conclude that Castelino was not entitled to readmission.

Finally, Castelino's claim that "Rose-Hulman's falling short of any of its procedures is arbitrary or capricious, by definition" (Appellant's Br. 38) finds no support whatsoever in the case law. Instead, the cases establish that deviations from University policy alone will *not* establish a claim for breach of contract. *See Amaya*, 981 N.E.2d at 1241 ("[E]ven assuming that IUSM failed to strictly follow the procedures outlined in all its handbooks and codes or to publish its procedures in specific accordance with accreditation standards as asserted by Amaya, that does not automatically lead to a finding of breach of contract on the part of IUSM.") At best, Castelino provided evidence of inconsequential deviations from various procedures in the Student and Faculty Handbooks. He has failed to identify any facts in the record that could plausibly lead to the conclusion that Rose-Hulman undertook "the conscious doing of a wrong because of dishonest purpose or moral obliquity" or had "a state of mind affirmatively operating with furtive design or ill will." *Id.* at 1242 (quoting *Gordon*, 862 N.E.2d at

1253). Rose-Hulman is thus entitled to summary judgment on Castelino's breach of contract claims.

Castelino's remaining arguments are even more insubstantial, and we consider them only briefly, bearing in mind his failure to develop them in any meaningful way.

### Defamation

Castelino argues (1) that including the word "suspended" on his transcripts (shared with other schools) amounted to libel per se; (2) that Dr. Chapman defamed him in the letter accusing him of academic misconduct for using the cut and pasted slides; and (3) that Dr. Sutterer defamed Castelino by lying to the Rules and Discipline Committee about a signature on Castelino's course drop sheet.

The district court concluded that, assuming Dr. Chapman's letter was defamatory, it was protected by privilege. Under Indiana law, qualified privilege is a defense to a defamation action and applies to "communications made in good faith on any subject matter in which the party making the communication has an interest or in reference to which he has a duty, either public or private, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Bals v. Verduzco*, 600 N.E.2d 1353, 1356 (Ind. 1992) (internal quotations and citation omitted). As a professor, Dr. Chapman was obligated to hold students accountable for academic misconduct and also obligated to provide certain Rose-Hulman employees copies of any letters accusing a student of such misconduct. Accordingly, such a letter would be protected by qualified privilege absent some evidence that Dr. Chapman wrote and published it without belief or grounds for belief in

its truth. The district court concluded that Castelino had produced no such evidence, and thus his defamation claim based on Dr. Chapman's letter failed as a matter of law.

Castelino's arguments about defamation ultimately amount to his own conclusory statements that he was defamed. He makes no attempt to explain why Dr. Chapman's letter would not be protected by qualified privilege, fails to elaborate on why the word "suspended" on his transcripts was defamatory (he had been suspended after all), or identify any specific evidence tending to demonstrate defamation by Dr. Sutterer at Castelino's Rules and Discipline hearing. In short, he has waived any contention that the district court erred by granting summary judgment to Rose-Hulman on his state-law defamation claim. *See, e.g.*, *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

### Harassment

Castelino's claim for harassment is likewise so undeveloped as to be waived. *Id.* He asserts confusingly and without authority that Indiana's "criminal statute" imposed a duty and a standard of care for what he characterizes as the Indiana tort of "harassment." He makes no attempt to provide any specifics, and instead makes the blanket assertion that faculty correspondence about him "proves that Rose-Hulman's substandard behavior proximately resulted in Castelino's suspension." (Appellant's Br. 47.) On the contrary, the record establishes that Rose-Hulman substantially complied with its

own policies and procedures in its correspondence about Castelino's behavior.

### False Advertising

Castelino advanced a claim of false advertising in the district court based on an advertisement for Rose-Hulman claiming that the university "offers individual and small group tutoring." Castelino's claim hinged on his belief that advertising the availability of tutoring amounted to "fraudulent inducement" because Rose-Hulman did not offer tutors for upperclassmen. The district court concluded Castelino's claim fell "far short" of a "cogent, properly supported argument" and granted summary judgment to Rose-Hulman.

Nothing Castelino says on appeal provides any reason to revisit the district court's conclusion that he waived this argument by failing to properly develop it. He cites 15 U.S.C. § 1125(a) (prohibiting false and misleading representations of fact) in an attempt to shore up his claim, but fails to acknowledge that the protections of the Lanham Act are not available to consumers. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (noting that Lanham Act does not apply even when a consumer is "hoodwinked" into buying an inadequate product).

### Sanctions

That leaves the matter of the sanctions imposed against Castelino under Fed. R. Civ. P. 16(f). We review the district court's imposition of sanctions only for abuse of discretion. *Koehn v. Tobias*, 866 F.3d 750, 752 (7th Cir. 2017). As described above, despite an e-mail reminder a week in advance from

Rose-Hulman's counsel, Castelino's counsel ignored the district court's scheduling order and waited until the night before the settlement conference to serve Castelino's updated settlement demand on Rose-Hulman. Rule 16(f)(1)(c) authorizes the district court to impose sanctions "if a party or its attorney … fails to obey a scheduling or other pretrial order." Given Castelino's admitted failure to comply with the scheduling order, the district court was well within its discretion to sanction his counsel. Castelino seems to admit as much, but then argues inexplicably that the district court was obligated to sanction Rose-Hulman as well. We see nothing in the record to suggest sanctions were required or warranted against Rose-Hulman. Indeed, we are inclined to sanction Castelino's attorney John Thrasher for his brief and arguments on appeal. Rose-Hulman, however, has not requested sanctions, so we will close with an observation and warning to Castelino's counsel that the brief he submitted was deficient, and that future filings of this sort will result in an order to show cause why he should not be sanctioned. *See Veal-Hill v. Comm'r of IRS*, 826 Fed. Appx. 565 (7th Cir. Oct. 14, 2020) (unpublished order) (issuing order to show cause for attorneys' briefs "practically devoid of coherent legal argument").

### III.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit